[L.A. No. 31970. Dec. 30, 1985.]

CHRISTINE A. MURPHY, Plaintiff and Appellant, v.
E. R. SQUIBB & SONS, INC. et al., Defendants and Respondents.

674

COUNSEL

David Manning Chodos, Joseph A. Shaub and Simke, Chodos, Silberfeld & Soll for Plaintiff and Appellant.

Haight, Dickson, Brown & Bonesteel, Robert L. Dickson, Ralph Campillo, Roy G. Weatherup, Baker & Camusi, William P. Camusi and Philip J. Brimble for Defendants and Respondents.

Richard D. Waugh, Downey, Brand, Seymour & Rohwer, Marsha N. Cohen, Hassard, Bonnington, Rogers & Huber, David E. Willett, Richard R. Sheridan, Crosby, Heafey, Roach & May, Richard J. Heafey, Peter W. Davis and James C. Martin as Amicus Curiae on behalf of Defendants and Respondents.

OPINION

**MOSK, J.**—We consider issues relating to the liability of a manufacturer and a pharmacy for the production and sale of an allegedly defective drug, stilbestrol (DES). We will decide whether a pharmacy at which the drug was purchased may be held strictly liable for alleged defects in the product (as distinguished from ordinary negligence), and whether a manufacturer which sold 10 percent of DES nationwide may be found to have had a "substantial" share of the market for the purpose of applying the "market share" doctrine enunciated in *Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061].

Plaintiff filed an action for personal injuries allegedly resulting from DES taken by her mother in 1951 and 1952 during pregnancy for the purpose of reducing the risk of miscarriage. The complaint sought damages on the theory of strict liability, alleging that the drug was defectively designed, with the result that plaintiff developed clear cell adenocarcinoma at the age of 23. As defendants, plaintiff joined Exclusive Prescription Pharmacy Corporation (Exclusive) where plaintiff's mother purchased the DES, and E.R. Squibb & Sons, Inc. (Squibb). The first cause of action alleged that Squibb was the manufacturer of the DES used by plaintiff's mother. The second count, added after our decision in *Sindell,* alleged that plaintiff was unable to identify the manufacturer, but that Squibb supplied a "substantial percentage" of DES for use by pregnant women to prevent miscarriage.

Before jury selection began, the court granted Exclusive's motion for judgment on the pleadings, holding that a pharmacy may not be held strictly liable for dispensing a prescription drug. The court determined that Exclusive rendered a professional service in supplying the DES, that the consumer of the drug was the doctor who prescribed it rather than plaintiff's mother, and that as a matter of policy the doctrine of strict liability should not be extended to a pharmacy.

In support of her second cause of action plaintiff offered to prove that Squibb sold 10 percent of the DES in the national market. The court ruled that as a matter of law 10 percent of the national market was not a "substantial percentage" within the meaning of *Sindell,* and it dismissed the second cause of action. The matter went to trial against Squibb on the first cause of action alleging that Squibb had actually supplied the DES taken by plaintiff's mother.[1] The parties introduced evidence on whether Squibb was the manufacturer of the offending drug, and the trial court instructed the

---

[1]The trial court granted Squibb's motion to bifurcate the trial into two phases, with the question of product identification to be tried first.

jury that plaintiff had the burden of proof on this issue. The jury returned a special verdict, finding that plaintiff's mother had purchased the DES at Exclusive, and that the DES which she purchased was not manufactured by Squibb. The trial court entered judgment in favor of defendants, and plaintiff appeals.

*The Action Against Exclusive*

In the seminal case of *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], Justice Traynor, writing for the court, held a manufacturer strictly liable in tort for injuries caused by a defective product which it knew would be used without inspection for defects. In *Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256 [37 Cal.Rptr. 896, 391 P.2d 168], the strict liability doctrine was extended to retailers of defective products.

Plaintiff asserts that a pharmacy which sells prescription drugs is in the same position as a retailer of any other consumer product, and that the reasons advanced in *Greenman* and *Vandermark* for imposing strict liability necessarily apply to a pharmacy. Exclusive counters that a pharmacist who dispenses a prescription drug is primarily furnishing a service rather than selling a product, and that the rationale underlying imposition of strict liability does not justify application of the doctrine to him.

Before reaching the merits of these conflicting claims, we observe that pharmacists perform a broad range of tasks, from selling razor blades and dental floss to treating patients in a health care facility by ordering laboratory tests and administering drugs by injection (Bus. & Prof. Code, § 4046, subd. (c)(4)) and acting as consultants regarding medication prescribed for patients at such facilities (Cal. Admin. Code, tit. 22, § 72375). The discussion which follows relates only to the duties in a community pharmacy of a pharmacist who fills prescriptions for drugs on the order of a physician or other medical care provider, and who has used due care in compounding and labelling the drug.

There are no cases in California deciding whether a retail pharmacy is strictly liable for injuries caused by an inherent defect in a drug. In Florida (*McLeod* v. *W.S. Merrell Co.* (Fla. 1965) 174 So.2d 736, 739), North Carolina (*Batiste* v. *American Home Products Corp.* (1977) 32 N.C.App. 1 [231 S.E.2d 269, 275]) and New York (*Bichler* v. *Willing* (1977) 58 App.Div.2d 331 [397 N.Y.Supp.2d 57, 59-60]) a pharmacy is held not to be strictly liable for defects in a prescription drug. These cases rely on section 402A of the Restatement Second of Torts, which declares that unavoidably unsafe products such as drugs are not defective if they are accom-

panied by an appropriate warning (*id.*, com. k), and that a seller is only required to warn of defects of which he knew or should have known (*id.*, com. j).

It is critical to the issue posed to determine if the dominant role of a pharmacist in supplying a prescription drug should be characterized as the performance of a service or the sale of a product. Both parties accept as a general rule that "those who sell their services for the guidance of others . . . are not liable in the absence of negligence or intentional misconduct." (*Gagne* v. *Bertran* (1954) 43 Cal.2d 481, 487 [275 P.2d 15].) This principle was applied in *Carmichael* v. *Reitz* (1971) 17 Cal.App.3d 958 [95 Cal.Rptr. 381], the primary authority on which the trial court relied. A doctor who prescribed a drug purchased by the patient at a pharmacy was held not to be strictly liable for injuries resulting from its use. In response to the argument of the plaintiff that the doctor was "in a sense a retailer" of the drug, the court stated that the doctor prescribed the medication only as an aid to effect a cure and was not in the business of selling the drug. The court observed, "[T]he distinction between a transaction where the primary objective is the acquisition of ownership or use of a product and one where the dominant purpose is to obtain services has not been obliterated. Where the services sought are professional in character, the distinction applies *a fortiori.*" (*Id.*, at p. 978.) On this theory, a hospital was held not strictly liable as the "supplier" for injuries arising out of the use of a surgical needle which broke during an operation. (*Silverhart* v. *Mount Zion Hospital* (1971) 20 Cal.App.3d 1022, 1027 [98 Cal.Rptr. 187, 54 A.L.R.3d 250].)

*Magrine* v. *Krasnica* (1967) 94 N.J.Super. 228 [227 A.2d 539], held that a dentist was not strictly liable for injuries caused by a needle which broke during the course of treatment due to a latent defect. The court characterized the difference between a sale and a service as follows: "[T]he *essence* of the transaction between the retail seller and the consumer relates to the *article sold*. The seller is *in the business* of supplying the product to the consumer. It is that, and that alone, for which he is paid. A dentist or physician offers, and is paid for, his professional services and skill. That is the *essence* of the relationship between him and his patient." (*Id.*, at p. 543.) (Accord: *Babcock* v. *Nudelman* (1937) 367 Ill. 626 [12 N.E.2d 635] [holding optometrists and oculists who examined eyes and sold eyeglasses, exempt from a tax imposed on retailers of tangible goods on the ground that their main objective was to provide a service and that the sale of eyeglasses was purely incidental to the service]; see also *Barbee* v. *Rogers* (Tex. 1968) 425 S.W.2d 342.)

As might be anticipated, the parties differ sharply as to whether the main function of a pharmacist is to provide a service or to sell a product. Plaintiff

asserts that the duties of a pharmacist in filling a prescription do not differ from those of any other retailer: he reads the prescription, fills the container with the proper type and dosage of the medication required, types up a label, attaches it to the container, and exchanges the medication for payment by the customer. In essence, argues plaintiff, a pharmacist is the functional equivalent of "an experienced clerk at a hardware store."

Exclusive and amici curiae[2] paint a dramatically different picture of the role of the pharmacist, characterizing him as a professional who provides an important health service. They point out that with a few exceptions specified by statute, only a physician or a licensed pharmacist may compound or dispense prescription drugs (Bus. & Prof. Code, § 4050 et seq.).[3] In order to obtain a license, a pharmacist must have graduated from a four-year college of pharmacy or the department of pharmacy of a university, have one year of practical experience under the supervision of a registered pharmacist, and pass a written examination given by the California State Board of Pharmacy (Board) (§§ 4085, 4087). He must comply with continuing education requirements as a condition to renewal of his license (§ 4098.5), and is subject to rules of professional responsibility and to disciplinary proceedings for violation of those rules (§ 4350 et seq.).

A pharmacist is required not only to assure that the drug prescribed is properly selected, measured and labelled but, according to the Board, he must be alert to errors in prescriptions written by doctors, and contact the doctor in case of doubts or questions regarding the drug prescribed. In addition, the pharmacist may discuss with the patient the proper use of the drug and the potential side effects, and must be aware of the possibility of harmful interaction between various medications which the pharmacist knows the patient is using. According to the Board, about 22 percent of patients are counseled by the pharmacist, who spends one and one-half to two hours a day in such consultation. (Citing Cal. Pharm. (Jan. 1985) 1984 Lilly Digest Rep., p. 33, table 19.)

It seems clear to us that the pharmacist is engaged in a hybrid enterprise, combining the performance of services and the sale of prescription drugs. It is pure hyperbole to suggest, as does plaintiff, that the role of the pharmacist is similar to that of a clerk in an ordinary retail store. With a few exceptions, only a licensed pharmacist may dispense prescription drugs, and as indicated above there are stringent educational and professional require-

---

[2]Amici curiae briefs on behalf of Exclusive were filed by the American Pharmaceutical Association and California Pharmacists Association, as well as by the California State Board of Pharmacy and the Califonia Medical Association.

[3]All further statutory references are to the Business and Professions Code unless otherwise noted.

ments for obtaining and retaining a license. A pharmacist must not only use skill and care in accurately filling and labelling a prescribed drug, but he must be aware of problems regarding the medication, and on occasion he provides doctors as well as patients with advice regarding such problems. In counseling patients, he imparts the same kind of information as would a medical doctor about the effects of the drugs prescribed. A key factor is that the pharmacist who fills a prescription is in a different position from the ordinary retailer because he cannot offer a prescription for sale except by order of the doctor. In this respect, he is providing a service to the doctor and acting as an extension of the doctor in the same sense as a technician who takes an X-ray or analyzes a blood sample on a doctor's order.

Nevertheless, it cannot be disputed that a sale in fact occurs. There is an obvious distinction between the doctor who provides a patient with a prescription for a defective drug (*Carmichael, supra,* 17 Cal.App.3d 958), a dentist who uses a faulty drill (*Magrine, supra,* 227 A.2d 539) or a hospital that uses a defective needle during surgery (*Silverhart, supra,* 20 Cal.App.3d 1022), and a pharmacist who fills a prescription. The pharmacist is in the business of selling prescription drugs, and his role begins and ends with the sale. His services are rendered only in connection with the sale, and a patient who goes to a pharmacy to have a prescription filled generally is seeking to purchase the drug rather than to obtain the advice of the pharmacist.

By contrast, the doctor, dentist and hospital in the cases cited above are not in the business of selling the drug or device; they use the product in the course of treatment as one element in their efforts to effect a cure, and furnishing the services does not depend on sale of a product.

Ordinarily, in deciding whether the sale or service aspect of an enterprise predominates, we would confine our consideration to the type of factors discussed above. In the case of a pharmacy, however, we must broaden our inquiry. The Legislature has provided in section 4046 that the practice of pharmacy is not only a profession (subd. (a)), but also a "dynamic patient-oriented *health service* that applies a scientific body of knowledge to improve and promote patient health by means of appropriate drug use and drug related therapy" (subd. (b)). (Italics added.)

This declaration that a pharmacist provides a health service is similar to section 1606 of the Health and Safety Code, which declares that the distribution or use of whole blood or plasma is a service for all purposes and shall not be construed to be a sale. ■ The object of section 1606 is to avoid application of the doctrine of strict liability to those who make or sell blood or blood plasma, or to those who use it in blood transfusions, thereby

promoting the constant availability of an adequate supply of blood. (*Mc-Donald* v. *Sacramento Medical Foundation Blood Bank* (1976) 62 Cal.App.3d 866, 872 [133 Cal.Rptr. 444].) In keeping with this purpose, it is held that a hospital using blood in a transfusion (*Shepard* v. *Alexian Brothers Hosp.* (1973) 33 Cal.App.3d 606 [109 Cal.Rptr. 132]), a blood bank supplying the blood (*McDonald*) and a manufacturer of blood plasma selling it for transfusion (*Fogo* v. *Cutter Laboratories, Inc.* (1977) 68 Cal.App.3d 744 [137 Cal.Rptr. 417]) are immune from strict liability because the Legislature has declared in section 1606 that they are providing a service rather than making a sale.

It is true that section 1606 of the Health and Safety Code provides not only that the distribution and use of blood and blood plasma is a service, but also that they should be deemed not to constitute a sale, whereas section 4046, subdivision (b), does not expressly declare that a sale is not involved in the practice of pharmacy. Nevertheless, the Legislature could not have been unaware when it enacted this provision that a pharmacist's main function is to fill prescriptions for medications that are sold to the public. Indeed, from a comparative functional aspect, a pharmacist's role is more aptly characterized as the performance of a service than that of the manufacturer and seller of blood plasma. The Legislature must have intended, therefore, that even though a pharmacist is paid for the medication he dispenses, his conduct in filling a prescription is to be deemed a service, and, like the manufacturer of blood plasma, a pharmacy is immune from strict liability.

We reject plaintiff's suggestion that because subdivision (b) of section 4046 was enacted at the same time as subdivision (c) of the section (which authorizes a pharmacist to order laboratory tests and give injections in health care facilities) the declaration that the practice of pharmacy provides a "health service" was intended to apply only to a pharmacist acting in that capacity. (Stats. 1981, ch. 989, § 1, p. 3830.) To the contrary, the broad wording of subdivision (b) indicates that it applies to the practice of pharmacy in general, and we so construe it.

There is no definitive legislative history of subdivision (b), and we are not certain, therefore, of the Legislature's motivation in shielding pharmacies from strict liability. The Legislature may have determined that it is not in the public interest to subject them to strict liability, because (like the need to assure an adequate supply of blood plasma) the wide availability of a full range of prescription drugs at economical cost outweighs the advantage to the individual consumer of being able to recover for injuries on a strict liability basis rather than to be limited to claims arising from negligence.

If pharmacies were held strictly liable for the drugs they dispense, some of them, to avoid liability, might restrict availability by refusing to dispense

drugs which pose even a potentially remote risk of harm, although such medications may be essential to the health or even the survival of patients. Furthermore, in order to assure that a pharmacy receives the maximum protection in the event of suit for defects in a drug, the pharmacist may select the more expensive product made by an established manufacturer when he has a choice of several brands of the same drug. As the Board's amicus brief warns, "Why choose a new company's inexpensive product, which has received excellent reviews in the literature for its quality, over the more expensive product of an established multinational corporation which will certainly have assets available for purpose of indemnification 10, 20, or 30 years down the line?"

The Legislature might have decided also that, since the doctor who ordered the drug provided by the pharmacy cannot be held strictly liable for its defects and in some circumstances the manufacturer who created the defect can also escape liability, it would be unfair and burdensome to expose the pharmacy alone to strict liability since it may provide the drug only on a doctor's prescription, which the pharmacist must strictly follow.[4] Plaintiff emphasizes that some pharmacies are owned by large chain store operations which are as capable as large drug manufacturers to respond in damages. But most pharmacies are not in this category. According to the Board, approximately 3,385 pharmacy permits are held in California by independent operators of 3 or fewer pharmacies, many of which are single drugstores owned by the operating pharmacist. Only 1,165 permits are held by operators of 4 or more pharmacies, and 642 permits are held by hospital pharmacies.

Finally, plaintiff contends that even if the pharmacist is personally exempt from strict liability because he provides a service, the "merchandising organization which employs him . . . should not be so exempted." Plaintiff cites no authority in support of this claim, and we perceive no basis in law or rationale for accepting it. The fact that a pharmacy may be owned by an enterprise which also deals in ordinary merchandise does not justify the conclusion that it should be held strictly liable when it performs a service. Moreover, the policy justifying the grant of immunity from strict liability to the practice of pharmacy would only be effectuated if the pharmacy operation itself is exempted.

For the reasons stated above, we conclude that the trial court was correct in granting judgment on the pleadings to Exclusive.

---

[4]The only discretion allowed the pharmacist is the substitution of a generic equivalent, unless the doctor specifies otherwise. (§ 4047.6.)

*The Action Against Squibb*

Plaintiff alleged in her second cause of action that she could not identify the specific manufacturer of the drug taken by her mother and that Squibb "supplied a substantial percentage" of the drug to prevent miscarriage.

By these allegations, plaintiff sought recovery under the "market share" theory advanced in *Sindell* v. *Abbott Laboratories, supra,* 26 Cal.3d 588. In that case, the plaintiff charged in her complaint that defendant manufacturers of DES, with knowledge that it might cause cancer in the daughters of the mothers who took the drug, failed to adequately test it for safety or to warn of its dangers. She could not identify the producer of the drug actually ingested by her mother, and for that reason the trial court sustained defendants' demurrers to the complaint.

We reversed the judgment, reasoning substantially as follows: The general rule is that the burden of proof is on the plaintiff to establish that the injuries she suffered were caused by the conduct of the defendant. This rule is not without its exceptions, however, including the doctrine of "alternative liability" applied in *Summers* v. *Tice* (1948) 33 Cal.2d 80 [199 P.2d 1, 5 A.L.R.2d 91]. In *Summers,* the plaintiff had suffered an injury to his eye after the two defendants had each shot a gun in his direction. The plaintiff was unable to demonstrate which of the defendants was responsible for his injury. It was held that he was not barred from pursuing the action, because the circumstances justified shifting the burden of proof to the two defendants to absolve themselves if they could. This would not be unfair, it was reasoned, because both had acted negligently toward the plaintiff, and they would both escape liability if the plaintiff were forced to choose between them and was unable to isolate which was responsible. We declined to apply this holding without modification to the drug manufacturer defendants in *Sindell.*

Nevertheless, we held in *Sindell,* because of policy considerations spelled out in our opinion, that plaintiff and those in her position should not be bereft of a remedy. We stated that the likelihood that any of the defendants caused the plaintiff's injuries should be measured not by the number of DES manufacturers joined as defendants—only five of two hundred manufacturers were defendants in the action—but by the percentage which the DES sold by each of them for the purpose of preventing miscarriage bore to the entire production of the drug sold by all producers of the identical formula for that purpose. If plaintiff joined in the action the manufacturers of "a substantial share of the DES which her mother might have taken, the injustice of shifting the burden of proof to defendants to demonstrate that they could not have made the substance which injured plaintiff" would be con-

siderably diminished. (26 Cal.3d at p. 612.) We recognized that there were practical problems involved in defining the market and determining market share, but held that these were matters of proof which could not be determined at the pleading stage. (*Id.*, at p. 613.)

The *Sindell* decision has generated numerous commentaries. (E.g., *DES Ruling Shakes Product Liability Field* (1980) 66 A.B.A. J. 827; Note (1982) 18 Cal. Western L.Rev. 143; Note (1981) 11 Golden Gate L.Rev. 917; Note (1981) 94 Harv.L.Rev. 668; Note (1982) U. Ill.L.Rev. 1003; Note (1981) 60 Neb.L.Rev. 432; Note (1981) Okla.L.Rev. 843; Note (1981) 8 Pepperdine L.Rev. 1011; Note (1981) 33 Stan.L.Rev. 937; Note (1981) Utah L.Rev. 655; Comment (1981) 26 Vill.L.Rev. 997.) Some of these comments relate to the appropriate composition of the market for application of the market share doctrine and the meaning of the term "substantial share" as used in the opinion. (E.g., Fischer, *Products Liability—An Analysis of Market Share Liability* (1981) 34 Vand.L.Rev. 1623, 1642-1645; Note (1981) 69 Cal.L.Rev. 1179, 1189-1193, 1197-1199; Comment, *The Market Share Theory* (1981) 19 Hous.L.Rev. 107, 128-129.)

At the trial level here, plaintiff confined her offer of proof to a national market for DES. ▮ Our only inquiry, therefore, is whether, as the trial court determined, a 10 percent share of this market is insufficient as a matter of law to allow plaintiff to proceed on the basis of the market share doctrine.

Plaintiff appears to contend that the doctrine was designed to accomplish a fair approximation of the damages which each defendant DES manufacturer would be required to pay under the principles of comparative fault (*American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899]), and that its applicability is unrelated to whether plaintiff has joined as defendants the manufacturers of a substantial share of the DES market. This claim lacks merit. The major issue decided in *Sindell* was whether and the circumstances under which a plaintiff in a DES case could avoid application of the usual rule that she had the burden of proving the defendant manufacturer produced the DES which caused her injuries. The opinion makes it clear that in order to shift the burden of proof on the issue of causation in fact, a plaintiff must join in the action the manufacturers of "a substantial share of the DES which her mother might have taken." (26 Cal.3d at p. 612.) Although we stated that the defendant manufacturers could cross-complain against other DES manufacturers not joined in the action, which might have supplied the injury-causing product, we were careful to qualify the statement with the observation that such pleadings would be filed by defendants only after "plaintiff has met her burden of joining the required defendants." (*Ibid.*)

We must determine, therefore, whether Squibb's 10 percent market share is a substantial percentage of the market for the application of the rule laid down in *Sindell.* Plaintiff, relying on general definitions of the word "substantial" asserts that the term must be defined in the context of a particular case,[5] and since Squibb was alleged to be the second largest seller of DES in the country, its 10 percent market share must be deemed substantial in the framework of DES litigation.

We reject this contention because it is contrary to the theoretical justification underlying the market share doctrine. We pointed out in *Sindell* that a major reason why shifting the burden of proof from plaintiff to defendants was warranted in *Summers* was that both parties who were or could have been responsible for the harm to the plaintiff were joined as defendants. Thus, there was a 50 percent chance that one of the defendants was responsible for the injury. (26 Cal.3d at p. 602.) We declined to apply an unmodified *Summers* rationale to the facts in *Sindell,* because only five of the two hundred manufacturers of the DES which could have harmed plaintiff were before the court, and therefore there was "no rational basis upon which to infer that any defendant in this action caused plaintiff's injuries, nor even a reasonable possibility that they were responsible." (*Id.,* at pp. 602-603.) Instead, we concluded that the likelihood that one of the defendants supplied the DES should be determined not by the number of manufacturers joined in the action but by the percentage which the DES sold by each to prevent miscarriage bore to the entire production of the drug sold for that purpose. We held that if the plaintiff joined in the action the manufacturers of a substantial share of the DES which her mother might have taken, the injustice of shifting the burden of proof to defendants to exonerate themselves would be significantly diminished. We declined to declare a specific percentage of the market which would satisfy application of the doctrine, but stated only that it must be substantial.

Since Squibb had only a 10 percent share of the DES market, there is only a 10 percent chance that it produced the drug causing plaintiff's injuries, and a 90 percent chance that another manufacturer was the producer. In this circumstance, it must be concluded that she failed to meet the threshold requirement for the application of the market share doctrine. The trial court was justified in ruling, therefore, that she could not proceed to trial on the second cause of action.

---

[5]In *Robinson* v. *Northern American Life & Cas. Co.* (1963) 215 Cal.App.2d 111, 117 [30 Cal.Rptr. 57], the term "substantial" was defined as "not seeming or imaginary, not illusive, real, true, important, essential, material, having good substance . . . . It means considerable in amount, time, or the like . . . ." *Atchison etc. Ry. Co.* v. *Kings County Water Dist.* (1956) 47 Cal.2d 140, 144 [302 P.2d 1], described the word as "a relative term, its measure to be gauged by all the circumstances surrounding the matter in reference to which the expression has been used."

The trial of the first cause of action, which was confined to the question whether Squibb was in fact the manufacturer of the drug taken by plaintiff's mother, concluded with a jury verdict in Squibb's favor. Since plaintiff had the burden of proof on this issue, her contention that the trial court erred in instructing the jury to that effect is without merit.

The conclusion that Exclusive may not be held strictly liable and that plaintiff cannot proceed against Squibb on a market share theory makes it unnecessary to discuss other issues raised by plaintiff.

The judgment is affirmed.

Reynoso, J., concurred.

**GRODIN, J.—**▇▇ ▇▇ I concur in the majority's resolution of the issues surrounding the action against Squibb,[1] and in its determination that the pharmacy here is not subject to strict liability. ▇▇ Quite apart from the extent to which pharmacists are expected to provide a service in addition to a product—a question with which not only this court, but also the pharmacy profession is presently grappling—[2]I conclude *Bertran*'s exemption from strict liability for "those who sell their services for the guidance of others" (*Gagne* v. *Bertran* (1954) 43 Cal.2d 481, 487 [275 P.2d 15]) does not, and was never intended to, exempt from such liability one who renders a service incidental to a sale. I also conclude, however, that *Vandermark*'s extension of strict liability to retailers of consumer products (*Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256 [37 Cal.Rptr. 896, 391 P.2d 168]) does not, and was never intended to, subject to such liability one whose authority to sell a product is strictly regulated by a comprehensive statutory scheme, and who dispenses his prescription drug product only at the direction of another who is himself exempt from such liability.

A person with a broken leg does not visit an orthopedist in order to purchase plaster, nor does one with crooked teeth seek out an orthodontist to acquire stainless steel wire, although both might acquire those items from such a professional during the course of treatment. "Sale" of the plaster or

---

[1]Justice Kaus, in his dissent, advocates modification of *Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061] to eliminate the "substantial share" requirement. Whatever merit there may be in that position, I am not prepared to adopt it in this case, where it has been neither briefed nor argued.

[2]See Brushwood, *The Informed Intermediary Doctrine and the Pharmacist's Duty to Warn* (1983) 4 J. Legal Med. 349 (describing the "evolving" service-oriented pharmacy practice) and articles discussed and cited in footnotes 7-11, and text and footnotes at footnotes 71-78, 97-101; Greenfield & Hirsh, *Pharmacist Liability in Tort,* 1983 Med. Trial Tech. Q. 434, 453 (concluding that "the modern pharmacist's role in the marketing of drugs is in a state of flux").

wire will not subject the doctor or dentist to strict liability for defects in those products because that "sale" is merely incidental to the patient's real purpose—obtaining a professional service. (*Carmichael* v. *Reitz* (1971) 17 Cal.App.3d 958, 977-979 [95 Cal.Rptr. 381]; *Magrine* v. *Krasnica* (1967) 94 N.J.Super. 228 [227 A.2d 539, 543].)

On the other hand, one normally does not patronize a pharmacist merely to ask for prescription advice. Although the pharmacist might well discuss with a customer such matters as whether a particular prescription drug may adversely react with other prescription drugs he is taking, or whether continuing to take a particular prescription drug will cause accumulation of excessive quantities of dangerous substances in his body, such a service would be rendered incidental to the real reason for the customer's visit— acquisition of a prescribed drug. Because the pharmacist's service (to the extent it exists in a given case) is merely incidental to a sale, the rendering of such a service cannot exempt a pharmacy from strict liability.

Nevertheless, I conclude that nothing in our previous decisions, nor the decisions of any other state, either directly or by analogy supports extension of strict liability to retail pharmacists who sell prescription drugs.

A pharmacist is not free to sell a prescription drug to anyone who merely requests the product and offers payment; unlike a car dealer or a tire vendor, a pharmacist may dispense his prescription drugs only after being authorized to do so by a prescribing physician or similar person. (Bus. & Prof. Code, § 4036, subd. (a).) In preparing the drug and selling it to his customer on the prescriber's authorization, the pharmacist simply carries out what the prescriber orders. Although he has some limited discretion in the matter— i.e., he may (i) under certain circumstances, fill the prescription with a less costly substitute containing the same ingredients,[3] or (ii) consult the prescribing physician if he believes the prescription is mistaken or otherwise inappropriate in light of the patient's other prescriptions—final authority for ordering the prescription filled still rests exclusively with the prescribing physician. At the same time, the physician, whose responsibility it is to properly diagnose, counsel, prescribe and warn his patient about proper use and risks associated with the prescribed drug, is exempt under *Bertran* from strict liability for defects in the drug he orders the pharmacist to dispense. (*Carmichael* v. *Reitz, supra,* 17 Cal.App.3d at pp. 977-979.) In this situation—in which policy considerations intervene to exempt the primarily responsible actor (the prescriber) from strict liability—basic fairness and com-

---

[3](Bus. & Prof. Code, § 4047.6.) Under subdivision (c) of that section, the pharmacist who makes such a selection incurs no additional liability over that to which he would be otherwise subject.

mon sense dictate it would be fundamentally unfair to treat pharmacists like any other retailer of any other product.[4]

I conclude strict liability should not apply in the case of a retail pharmacist, whose authority to sell prescription drugs is closely regulated by statute, and who dispenses his product only at the direction of a prescriber who is himself exempt from such liability.[5]

LUCAS, J.—■■ I concur in the majority's resolution of the issues involving the claims against Squibb. ■■ In addition, I concur in the conclusion reached by the majority that the pharmacy here may not be held strictly liable for alleged defects in a medication that it provided pursuant to a physician's prescription.

I believe that Justice Grodin's concurrence, which analyzes why strict liability has no place in this context, is well taken. A pharmacist, whose role in dispensing medication is severely circumscribed by statutory scheme, and whose preparation of a drug may be undertaken only pursuant to prescription, should not be held liable when the prescriber is himself excepted from liability.

Unlike Justice Grodin, however, I find merit in Justice Mosk's statutory approach as well. Subdivision (b) of section 4046 of the Business and Professions Code states "Pharmacy practice is a dynamic patient-oriented health service that applies a scientific body of knowledge to improve and promote patient health by means of appropriate drug use and drug-related therapy." The Legislature has also announced that "In recognition of and consistent with the decisions of the appellate courts of this state, [it] hereby declares the practice of pharmacy to be a profession." (Bus. & Prof. Code, § 4046, subd. (a).) I believe that the Legislature had in mind more than mere hortatory language when it defined the practice of pharmacy in terms of the provision of service.

Both parties agree, as the majority reiterates, that the sale of a service does not render one liable " 'in the absence of negligence or intentional

---

[4]No other retailer who has been subjected to stringent statutory restrictions on his authority to sell a product has been subjected to strict liability for defects in the product sold. *Barth v. B. F. Goodrich Tire Co.* (1968) 265 Cal.App.2d 228 [71 Cal.Rptr. 306], in which strict liability was applied to a wholesale-retail tire distributor that sold whatever tires the manufacturer specified, is plainly distinguishable. There, the "restriction" on the retailer's authority to sell was imposed not by a rigid and comprehensive statutory scheme, but by a private contract that, if the retailer so desired, could presumably have been renegotiated or amended.

[5]In reaching this conclusion I, like the majority, express no view whatsoever on the applicability of strict liability principles to the manufacturer of a prescription drug.

misconduct.'" (See *ante,* p. 677.) The dissent matches Health and Safety Code section 1606, which states that transactions involving blood and blood products used for transfusions involve a service and are not to be viewed as a sale "for any purposes whatsoever," against the reference in section 4046 which characterizes the practice of pharmacy as a service. Chief Justice Bird concludes that because of the absence of language stating such transactions are not to be regarded as sales, one cannot discern in section 4046, subdivision (b), an intent to exempt a pharmacist's dispensing of prescription drugs from the reach of strict liability. I disagree. If services generally are recognized to be so exempted, and the Legislature specifically deems the practice of pharmacy a service, it seems to me that the only likely means of giving effect to his language is to interpret it in the same manner as that used for Health and Safety Code section 1606. The dissent gives no alternative interpretation for the statutory language nor does it explain how its approach renders subdivision (b) anything other than vacant jargon.

In summary, I join in the holding that pharmacists should not be held strictly liable for defects in drugs that they dispense at the direction of another.[1]

**BIRD, C. J.**—I dissent from the affirmance of the judgment in favor of defendant Exclusive Prescription Pharmacy Corporation (Exclusive). Under principles of products liability which are firmly established in this state, a retail druggist is strictly liable in tort for the sale of a defective prescription drug. Today's majority reach the opposite conclusion by retreating from sound principles which, in less turbulent times, were viewed as beyond serious challenge.

Specifically, the majority take a narrow and cramped view of the policies served by strict liability. Several of the most important policies, first articulated in the pioneering opinions of Chief Justice Roger Traynor, are not even mentioned. The majority's failure to address these policies has unfortunate consequences which go beyond their incorrect conclusion regarding liability.

As a result of this unfortunate opinion, doubts are cast on this court's past statements recognizing the applicability of the entire doctrine of strict liability to defective prescription drugs. In the process, the very foundations of the doctrine are called into question. I cannot join in a retreat from one of this court's most firmly established, highly acclaimed and beneficial adaptations of tort law to modern mass production and marketing methods.

---

[1] Like Justices Mosk, Grodin, and Kaus, I agree that the question of strict liability for drug manufacturers is not and need not be addressed here.

The majority also embrace elitist distinctions based on the professional status of retail druggists and, thereby, draw utterly contradictory conclusions regarding the significance of this status. Contradictions aside, professionalism has nothing to do with the central question to be answered here.

The issue is whether retail druggists and pharmacies, which sell prescription drugs to consumers, are engaged primarily in selling a product or in performing a service. The simple answer is that in the marketing of prescription drugs by retail druggists, as in the marketing of automobiles and other consumer products, the sale aspect predominates over any incidental service provided to the consumer. For this reason, and because every one of the policies served by strict liability would be advanced by applying the doctrine to the sale of a defective prescription drug by a retail druggist, I would reverse the judgment in favor of defendant Exclusive.

Chief Justice Traynor first proposed the doctrine of strict liability in tort as the basis of recovery in defective product cases in his landmark concurring opinion in *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 461 [150 P.2d 436]. He cited important public policy considerations that demanded this development in the law.

"Even if there [were] no negligence . . . public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market. It is evident that the manufacturer can anticipate some hazards and guard against the recurrence of others, as the public cannot. Those who suffer injury from defective products are unprepared to meet its consequences. The cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business. It is to the public interest to discourage the marketing of products having defects that are a menace to the public. If such products nevertheless find their way into the market it is to the public interest to place the responsibility for whatever injury they may cause upon the manufacturer, who, even if he is not negligent in the manufacture of the product, is responsible for its reaching the market. However intermittently such injuries may occur and however haphazardly they may strike, the risk of their occurrence is a constant risk and a general one. Against such a risk there should be general and constant protection and the manufacturer is best situated to afford such protection." (*Id.*, at p. 462.)

In *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], this court unanimously adopted Chief Justice Traynor's theory of strict liability in tort. *Greenman*

did not restrict the application of the doctrine to any subclass of products. Writing for the court, Chief Justice Traynor noted that such liability had been applied to a variety of products ranging from unwholesome food to defective vaccines. (*Id.*, at p. 62.) The court's formulation of the rule was correspondingly broad in scope. "A manufacturer is strictly liable in tort when an article he places on the market . . . proves to have a defect that causes injury to a human being." (*Ibid.*)

While *Greenman* presented only the question of a manufacturer's liability for a defective product, the policies underlying the strict liability doctrine apply to others in the marketing chain by which the product reaches the consumer. This was made clear a year later in *Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256 [37 Cal.Rptr. 896, 391 P.2d 168]. Chief Justice Traynor's opinion, again expressing the unanimous view of this court, held that a retailer is strictly liable in tort for defects in products it sells. (*Id.*, at pp. 262-263.)

"Retailers like manufacturers are engaged in the business of distributing goods to the public. They are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products. [Citation.] In some cases the retailer may be the only member of that enterprise reasonably available to the injured plaintiff. In other cases the retailer himself may play a substantial part in insuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end; the retailer's strict liability thus serves as an added incentive to safety.. Strict liability on the manufacturer and retailer alike affords maximum protection to the injured plaintiff and works no injustice to the defendants, for they can adjust the costs of such protection between them in the course of their continuing business relationship." (*Ibid;*[1] accord *Becker* v. *IRM Corporation* (1985) 38 Cal.3d 454, 459 [213 Cal.Rptr. 213, 698 P.2d 116].)

*Vandermark* was followed by a string of decisions affirming the importance and scope of the strict liability doctrine. (*Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 132-134 [104 Cal.Rptr. 433, 501 P.2d 1153] [rejecting the "unreasonably dangerous" gloss of Rest.2d Torts, § 402A];

---

[1] *Vandermark* echoed views Justice Traynor had expressed 20 years earlier in the *Escola* concurrence. Noting that retailers had long been held strictly liable for defects in the products they sold under the warranty of safety included in the implied warranties of fitness and merchantability, Chief Justice Traynor had observed in *Escola* that, as with the manufacturer, the retailer's duty had a basis in tort law. "This warranty is not necessarily a contractual one [citations], for public policy requires that the buyer be insured at the seller's expense against injury. [Citations.]" (*Escola, supra,* 24 Cal.2d at p. 464.) He also noted that the retailer was under an *absolute* liability to his customer even if the retailer was not equipped to test a product. (*Ibid.*)

*Luque* v. *McLean* (1972) 8 Cal.3d 136, 141-146 [104 Cal.Rptr. 443, 501 P.2d 1163] [applying strict liability to patent as well as latent defects]; *Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 248 [85 Cal.Rptr. 178, 466 P.2d 722] [applying the doctrine to bailors and lessors]; *Pike* v. *Frank G. Hough Co.* (1970) 2 Cal.3d 465, 475-477 [85 Cal.Rptr. 629, 467 P.2d 229] [applying strict liability to a defectively designed, as opposed to a defectively manufactured, product]; *Becker* v. *IRM Corporation, supra,* 38 Cal.3d at p. 464 [applying the doctrine to lessors of an apartment complex who purchased it after the defective product was installed]; see also *Barth* v. *B. F. Goodrich Tire Co.* (1968) 265 Cal.App.2d 228, 252-253 [71 Cal.Rptr. 306] [applying the doctrine to suppliers and distributors]; *Kriegler* v. *Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224, 227 [74 Cal.Rptr. 749] [builders of mass-produced homes]; *Garcia* v. *Halsett* (1970) 3 Cal.App.3d 319, 324-326 [82 Cal.Rptr. 420] [licensors].)

Although this court has never directly held that strict liability principles apply to prescription drugs, it has clearly endorsed the idea. *Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061] addressed the applicability of strict liability to prescription drugs—indeed, to diethylstilbestrol (DES), the drug plaintiff alleges caused her injuries in this case.

"From a broader policy standpoint, defendants are better able to bear the cost of injury resulting from the manufacture of a defective product. . . . [Quotation from Chief Justice Traynor's concurrence in *Escola* omitted. (See *ante,* at p. 689.)] The manufacturer is in the best position to discover and guard against defects in its products and to warn of harmful effects; thus, holding it liable for defects and failure to warn of harmful effects will provide an incentive to product safety. [Citations.] *These considerations are particularly significant where medication is involved,* for the consumer is virtually helpless to protect himself from serious, sometimes permanent, sometimes fatal, injuries caused by deleterious drugs." (*Sindell, supra,* 26 Cal.3d at p. 611, italics added; see *Greenman, supra,* 59 Cal.2d at p. 62 [vaccines]; *Grinnell* v. *Charles Pfizer & Co.* (1969) 274 Cal.App.2d 424, 432-434 [79 Cal.Rptr. 369] [vaccine]; *Toole* v. *Richardson-Merrell Inc.* (1967) 251 Cal.App.2d 689, 710-711 [60 Cal.Rptr. 398, 29 A.L.R.3d 988] [anti-cholesterol drug]; *Gottsdanker* v. *Cutter Laboratories* (1960) 182 Cal.App.2d 602, 607 [6 Cal.Rptr. 320, 79 A.L.R.2d 290] [vaccine]; *Brochu* v. *Ortho Pharmaceutical Corp.* (1st Cir. 1981) 642 F.2d 652, 654-659 [oral contraceptive]; *Reyes* v. *Wyeth Laboratories* (5th Cir. 1974) 498 F.2d 1264, 1274, cert. den., 419 U.S. 1096 [42 L.Ed.2d 688, 95 S.Ct. 687] [vaccine]; see generally *Finn* v. *G. D. Searle & Co.* (1984) 35 Cal.3d 691, 713-720 [200 Cal.Rptr. 870, 677 P.2d 1147] (dis. opn.); contra *Payton* v. *Abbott Labs* (1982) 386 Mass. 540 [437 N.E.2d 171, 189-190].)

The foregoing passage from *Sindell* and the earlier quotation from Chief Justice Traynor's concurrence in *Escola* identify several major policies served by the doctrine of strict liability: (1) providing maximum compensation to helpless victims for the often catastrophic costs of injuries caused by defective products; (2) providing an incentive for better design, manufacturing and testing procedures by placing those costs on the parties responsible for defective products reaching the market, thereby reducing injuries; (3) spreading the costs of injuries that do occur among those who benefit from the marketing and use of the product.

The majority opinion is strangely silent as to these policies, although each is fully applicable to the sale of prescription drugs by retail druggists. In particular, no mention whatsoever is made of *Sindell*'s clear statement on the applicability of strict liability to defectively designed prescription drugs.

Instead, the majority cite with apparent approval opinions from other jurisdictions holding that a pharmacy cannot be held strictly liable for design defects in any prescription drug, absent proof that it failed to warn of known dangers.[2] (See maj. opn., *ante,* at p. 676, citing *McLeod* v. *W. S. Merrell Co., Div. of Richardson-Merrell* (Fla. 1965) 174 So.2d 736, 739; *Batiste* v. *American Home Products Corp.* (1977) 32 N.C.App. 1 [231 S.E.2d 269, 275]; *Bichler* v. *Willing* (1977) 58 App.Div.2d 331 [397 N.Y.S.2d 57, 59-60].)

The opinions cited by the majority rely heavily on comment k to section 402A of the Restatement Second of Torts. Each interprets comment k as exempting prescription drugs from strict liability for design defects on the theory that all such drugs are unavoidably unsafe products which are useful to society.[3] That interpretation is squarely inconsistent with decisions of this

[2]Plaintiff here consciously rejected the "failure to warn" approach. As plaintiff explains, she "has not alleged in this case that DES was defective because defendants failed to warn of the risks attendant to the use of the drug. Quite [] the contrary, it was plaintiff's intention to prove that this drug should have never been marketed at all for use in pregnant women. It was ineffective for the indication promoted by Squibb and it caused cancer in the daughters of women who ingested the drug while pregnant. Suffice to say that a drug marketed for use in pregnant women bearing a warning that it is not to be used by pregnant women is conceptually ludicrous. Plaintiff refused to base her case on such thinly constructed logic, but rather elected to establish strict products liability on the manufacturer and retailer of this pharmaceutical product based on its defective design."

[3]The majority opinion does not rely on these cases or the Restatement's exemption from strict liability of prescription drugs as direct support for its holding that the pharmacies that sell such drugs are exempt. However, a reluctance to apply strict liability to prescription drugs is one of the opinion's recurring themes. This reluctance reappears, for example, when the majority permit themselves to speculate that the Legislature meant to exempt retail druggists from strict liability because "the wide availability of a full range of prescription drugs at economical cost outweighs the advantage to the individual consumer of being able to recover for injuries on a strict liability basis rather than to be limited to claims arising from negligence." (Maj. opn., *ante,* at p. 680; see *post,* at pp. 698-700.)

court spanning a quarter of a century which have affirmed the importance and breadth of the strict liability doctrine. (See *ante,* at pp. 689-691.)

Specifically, it is inconsistent with *Sindell's* recognition that strict liability policies are "particularly significant where medication is involved, for the consumer is virtually helpless to protect himself from serious, sometimes permanent, sometimes fatal, injuries caused by deleterious drugs." (*Sindell, supra,* 26 Cal.3d at p. 611.) It is also inconsistent with the alternative tests for design defect which this court unanimously adopted in *Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1].

The *Barker* court held that strict liability could be imposed on a theory of defective design under either of two tests. "First, a product may be found defective in design if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. Second, a product may alternatively be found defective in design if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design." (*Barker, supra,* 20 Cal.3d at p. 432.)

The "relevant factors" to be considered under the second test include "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design. [Citations.]" (*Id.,* at p. 431.) Because the focus in a strict liability case is on the condition of the product itself and not on the reasonableness of the defendant's conduct, *Barker* directed that the trier of fact should consider the state of knowledge available at the time of trial, rather than restricting itself to what was known or could have been known by the defendant when the product was sold. (See *id.,* at pp. 430, 434.)

The interpretation of comment k in the cases cited by the majority is inconsistent with *Barker* in at least two respects. First, these cases assume that comment k stands for the proposition that all prescription drugs are unavoidably unsafe products. That assumption appears unfounded.

The sole example given in the comment is the Pasteur treatment for rabies. Noting that the treatment "not uncommonly leads to very serious and damaging consequences," the comment concludes nonetheless that its marketing and use are fully justified "[s]ince the disease itself invariably leads

to a dreadful death . . . ." (Rest.2d Torts, § 402A, com. k.) Thus, the comment weighs the drug's harmful qualities against its benefits as the only efficacious product for treatment of a fatal disease.

This weighing of benefits and risks is consistent with the approach adopted in *Barker*. Application of the same weighing approach in a different context could well lead to a different conclusion. For example, the drug at issue might be only one of several formulas designed to treat a condition that, unlike rabies, is non-life threatening. The interpretation of comment k adopted by the majority's cases, by precluding a meaningful case-by-case weighing of known benefits and risks, is inconsistent with *Barker*.

However, comment k also states that "new or experimental drugs" should not be subject to strict liability for defective design when, "because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety . . ., but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk." (Rest.2d Torts, § 402A, com. k.) This reasoning and, to the extent they rely on it, the majority's cases are at odds with *Barker*.

As noted above, *Barker* emphasized that the focus in a strict liability case is on the safety of the product in light of the knowledge available to the trier of fact at the time of trial. (*Barker, supra,* 20 Cal.3d at pp. 430, 434.) "[T]he fact that the manufacturer took reasonable precautions in an attempt to design a safe product or otherwise acted as a reasonably prudent manufacturer would have under the circumstances, while perhaps absolving the manufacturer of liability under a negligence theory, will not preclude the imposition of liability under strict liability principles if, *upon hindsight,* the trier of fact concludes that the product's design is unsafe to consumers, users, or bystanders." (*Id.,* at p. 434, italics added; see *Finn* v. *G. D. Searle & Co., supra,* 35 Cal.3d at p. 722 & fn. 17 (dis. opn.).) The quoted passage from comment k, with its emphasis on the limited medical experience available when a new prescription drug is marketed, is inconsistent with *Barker*'s time-of-trial standard.[4]

---

[4]Here it bears noting that section 402A and comment k have remained unchanged since their adoption in 1965, only three years after *Greenman* and one year after *Vandermark.* The intervening years have witnessed a dynamic evolution in this court's approach to strict liability, while the Restatement's formulation has remained static.

This court has "not hesitated to reach conclusions contrary to those set forth in Restatement section 402A." (*Cronin, supra,* 8 Cal.3d at p. 131; see *Price* v. *Shell Oil Co., supra,* 2 Cal.3d at p. 253.) *Barker* concerned an alleged design defect in a high-lift loader. Accordingly, this court had no reason to discuss comment k or prescription drugs. However, the standard for design defects announced in *Barker* cannot be squared with the exemption for new prescription drugs advocated in comment k.

The majority's uncritical discussion of foreign cases exempting retail druggists from strict liability on the basis of comment k is troubling not so much because it provides the *ratio decidendi* of their opinion. As noted above, no direct reliance is placed on these cases or the Restatement approach. Rather, it is troubling because it reveals a willingness to deviate from established principles of strict liability where prescription drugs are concerned. At a more fundamental level, it suggests a weakened commitment to the well-established principles of strict liability in general.

Turning to the real question presented by plaintiff's appeal of the judgment on the pleadings in favor of defendant pharmacy, the majority concede that the retail druggist "is in the business of selling prescription drugs, and his role begins and ends with the sale. His services are rendered only in connection with the sale, and a patient who goes to a pharmacy to have a prescription filled generally is seeking to purchase the drug rather than to obtain the advice of the pharmacist." (Maj. opn., *ante,* at p. 679.) That statement should be enough to end the debate with a decision that the pharmacy is strictly liable for the sale of a defective prescription drug.

Under the test which the parties and the majority agree govern here, strict liability applies if the purchase of a product is the "primary objective" or "essence" of the transaction. (*Carmichael* v. *Reitz* (1971) 17 Cal.App.3d 958, 978 [95 Cal.Rptr. 381]; see *Magrine* v. *Krasnica* (1967) 94 N.J.Super. 228 [227 A.2d 539.) Strict liability is inapplicable only where the transaction is limited to the provision of a service and does not involve the sale of a product (*Gagne* v. *Bertran* (1954) 43 Cal.2d 481, 487 [275 P.2d 15] [defendant who performed soil tests not strictly liable]) or where the service aspect predominates and any sale included in the transaction is incidental to the provision of the service (*Silverhart* v. *Mount Zion Hospital* (1971) 20 Cal.App.3d 1022, 1027 [98 Cal.Rptr. 187, 54 A.L.R.3d 250] [hospital that supplied surgical needle which broke during operation not strictly liable]).

Accepting the majority's characterization of the retail druggist's business as "a hybrid enterprise, combining the performance of services and the sale of prescription drugs" (maj. opn., *ante,* at p. 678), it is nonetheless abundantly clear that the sale aspect predominates.

The majority's own statistics bear this out. Only 22 percent of patients who purchase prescription drugs are counseled by the retail druggist, who spends an average of only one and one-half hours a day performing this service. (See maj. opn., *ante,* at p. 678.) Thus, in the vast majority of prescription drug sales transactions, the customer receives only a product and no services from the retail druggist.

The predominance of the sale is also reflected by the fixed prices the retail druggist charges for prescription drugs, based on a markup from wholesale cost rather than an hourly fee calculation. (Compare *Gagne* v. *Bertran, supra,* 43 Cal.2d at p. 487 [hourly fee charged by soil tester showed that he was selling a service, not a product].)

The majority dismiss as "pure hyberbole" plaintiff's suggestion that the retail druggist's role is similar to that of a clerk in an "ordinary" retail store. Yet, the average hardware store clerk probably devotes as much or more time to counseling customers on the applications and proper use of the items offered for sale by the store. I doubt that the majority would have any difficulty concluding that the essence of the transaction between the hardware clerk and the customer is a sale rather than a service.

The majority, diverging from the inquiry into the nature of the transaction, contend that the educational and professional standards which must be met to obtain a pharmacist's license somehow dictate the conclusion that the retail druggist and the pharmacy are primarily engaged in the provision of a service. (See maj. opn., *ante,* at p. 678-679.) An almost mystical significance is attributed to the retail druggist's admitted expertise and professional status.

For example, the majority quote with approval language contained in *Carmichael* v. *Reitz, supra,* which suggests that once a defendant has been determined to be a professional, no inquiry into the nature of the transaction at issue is necessary. (See maj. opn., *ante,* at p. 677, quoting *Carmichael* v. *Reitz, supra,* 17 Cal.App.3d at p. 978. ["Where the services sought are professional in character, the [service/sale] distinction applies *a fortiori*"].) Nowhere do they explain how the retail druggist's professional status converts the business of selling prescription drugs, in which the provision of services plays a subordinate role, into a business in which the service aspect predominates.

The majority also draw contradictory conclusions from the high standards of knowledge and professional responsibility to which retail druggists are held. On the one hand, they stress the retail druggist's extensive knowledge of the properties, proper dosages, contraindications and side-effects of prescription drugs as support for the view that the retail druggist is primarily a seller of services rather than products. Yet, if anything, the retail druggist's expertise supports the imposition of strict liability.

Armed with extensive knowledge of the products he or she sells, the retail druggist may be better equipped than other retailers to identify defective products. This capacity was a prime consideration supporting the applica-

tion of strict liability to retailers. "[T]he retailer himself may play a substantial part in insuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end; the retailer's strict liability thus serves as an added incentive to safety." (*Vandermark, supra,* 61 Cal.2d at p. 262.)

On the other hand, the majority stress the statutory and professional restrictions that limit the retail druggist's discretion. Since a retail druggist may not sell a prescription drug except on a doctor's order and is prohibited from substituting a different drug (other than a generic equivalent), they suggest that it would be unfair to treat retail druggists like other retailers who are not subject to such restraints. This reasoning misses the point.

The retailer's capacity to select the product sold has *never* been held to be a *prerequisite* to the imposition of strict liability. On the contrary, the doctrine has been held to apply to a wholesale-retail tire distributor who supplied whatever tires the manufacturer specified. (*Barth* v. *B. F. Goodrich Tire Co., supra,* 265 Cal.App.2d at pp. 248-254.) This rule is consistent with the well-established principle that a retailer is strictly liable even though not equipped to test the product sold. (See *Escola, supra,* 24 Cal.2d at p. 464.) It is also consistent with the focus of the strict liability doctrine on the *product* rather than on the *conduct* of the defendant. (See *Barker, supra,* 20 Cal.3d at p. 434.)

The majority attempt to dispel any persisting doubts by referring to the language of Business and Professions Code section 4046. (See maj. opn., *ante,* at pp. 679-681.) They conclude that the Legislature intended this provision to exempt retail druggists and pharmacies from strict liability in the same manner that Health and Safety Code section 1606 exempts all persons involved in the distribution of blood and blood products (*Fogo* v. *Cutter Laboratories, Inc.* (1977) 68 Cal.App.3d 744 [137 Cal.Rptr. 417]; *McDonald* v. *Sacramento Medical Foundation Blood Bank* (1976) 62 Cal.App.3d 866 [133 Cal.Rptr. 444]; *Shepard* v. *Alexian Brothers Hosp.* (1973) 33 Cal.App.3d 606 [109 Cal.Rptr. 132]). However, when the two statutes are placed side by side, the differences are striking.

Health and Safety Code section 1606 provides in its entirety as follows: "The procurement, processing, distribution, or use of whole blood, plasma, blood products, and blood derivatives for the purpose of injecting or transfusing the same, or any of them, into the human body shall be construed to be, and is declared to be, for all purposes whatsoever, the rendition of a service by each and every person, firm, or corporation participating therein, and shall not be construed to be, and is declared not to be, a sale of such whole blood, plasma, blood products, or blood derivatives, for any purpose

or purposes whatsoever." It is difficult to imagine a clearer expression of an intent to create an exemption under the sale/service distinction established in the cases.

By contrast, subdivision (b) of Business and Professions Code section 4046 declares that the practice of pharmacy is a "dynamic patient-oriented health service that applies a scientific body of knowledge to improve and promote patient health by means of appropriate drug use and drug-related therapy." Conspicuously absent from the general language of this provision is a declaration regarding the nature of the specific transaction by which a retail druggist transfers a prescription drug to a customer—much less a declaration that this transaction is always to be construed as the rendition of a service and never as a sale.

The foregoing comparison establishes that when the Legislature intends to exempt an occupational group or activity from strict liability, it knows how to say so. (See *Johnson & Johnson* v. *Superior Court* (1985) 38 Cal.3d 243, 249-250 [211 Cal.Rptr. 517, 695 P.2d 1058].) It did so for those engaged in supplying blood and blood products when it enacted the explicit language of Health and Safety Code section 1606.

No such intention can be gleaned from the vague and general language concerning the practice of pharmacy in Business and Professions Code section 4046. No amount of speculation by this court regarding matters of which the Legislature "could not have been unaware when it enacted this provision" (maj. opn., *ante,* at p. 680) can make up for the absence of a declaration by the Legislature of the intent which the majority seek to attribute to it.

The majority do not stop at speculation regarding the Legislature's intent. They also engage in the purest form of speculation, attempting to divine the motivation which underlay this supposed intent. It is fair to say that the concerns they settle on are their own rather than the Legislature's. These concerns range from a fear that imposing strict liability on retail druggists would lead to a scarcity of life-saving drugs to a fear of increased prices. (See maj. opn., *ante,* at pp. 680-681.) The majority also express concern about the fairness of imposing strict liability on those retail druggists who are small, "independent operators," particularly because the prescribing doctor and, in some circumstances, the manufacturer, can escape liability. (*Id.,* at p. 681.)

Apart from the lack of evidence that the Legislature shared the majority's concern when it enacted Business and Professions Code section 4046, these arguments do not support the exemption of retail druggists from strict lia-

bility. There is no evidence that the imposition of strict liability would cause the supply of prescription drugs to dry up. Such fears are unfounded if one but reviews the experience with other retail sales businesses after they were made subject to strict liability.

For example, automobile dealers have been subject since *Vandermark* to strict liability for injuries caused by defects in the automobiles they sell. Although injuries from such defects are not uncommon, automobile dealers have continued in business, and there has been no noticeable decrease in the supply of cars for sale.[5]

As to the concern that prices might rise, this possibility has long been recognized and accepted as an integral part of the strict liability doctrine. (See, e.g., *Escola, supra,* 24 Cal.2d at p. 462 (conc. opn. of Traynor, J.) ["the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business"]; *Becker* v. *IRM Corporation, supra,* 38 Cal.3d at p. 466 ["The paramount policy of the strict products liability rule remains the spreading throughout society of the cost of compensating otherwise defenseless victims of manufacturing defects"].) The same can be said of the claim that it would be unfair to impose strict liability on a retail druggist if the manufacturer is unavailable to answer in damages.[6] "If anything, the unavailability of the manufacturer is a factor militating in favor of liability of persons engaged in the enterprise who can spread the cost of compensation." (*Id.;* accord *Ray* v. *Alad Corp.* (1977) 19 Cal.3d 22, 33-34 [136 Cal.Rptr. 574, 560 P.2d 3]; *Price* v. *Shell Oil Co., supra,* 2 Cal.3d at p. 251.) As this court observed in *Vandermark,* "[i]n some cases the retailer may be the only member of [the overall producing and marketing] enterprise reasonably available to the injured plaintiff. . . . Strict liability on the manufacturer and retailer alike affords maximum protection to the injured plaintiff and works no injustice to the defendants, for they can adjust the costs of such protection in the course of their continuing business relationship." (61 Cal.2d at pp. 262-263.)

---

[5]Plaintiff dryly offers the following observation in response to the argument of defendant Exclusive's amici American Pharmaceutical Association and California Pharmacists Association. "It has been said that the key to good appellate advocacy is to be able to convince the court that an adverse ruling means the end of modern civilization as we know it. Amicus APA-CPA's position is more modest, predicting only the demise of an entire profession and the total unavailability of prescription medicines for the sick. Some might find this view overly pessimistic, and take heart from the fact that, even after the *Vandermark* decision, both Ford Motor Company and its car dealerships somehow miraculously survived as viable business entities."

[6]The fact that the prescribing doctor cannot be held strictly liable for a defect in a prescription drug does not provide a sound basis for exempting the pharmacy that sells the drug. The doctor is exempted because, unlike the retail druggist, he or she is not in the business of selling drugs. Rather, the doctor prescribes medication only as part of the effort to effect a cure of the disease for which the patient sought the doctor's services. (*Carmichael* v. *Reitz, supra,* 17 Cal.App.3d at pp. 978-979.)

The majority stress the small size of many pharmacy businesses. However, it cannot be denied that a high volume of prescription drugs are currently marketed by large-scale, modern commercial enterprises. The fact that there continue to be many single drugstores owned by the operating retail druggist does not justify an exception.

As one commentator has noted, "the inception of strict liability is an outgrowth of the food laws and is based on the human consumption theory. There is no reason why this theory of strict liability should not include drugs. This would tend to make the retail druggist an insurer of the safety of the product, even though he had exercised all reasonable care. This liability without fault has been criticized in the past as putting small business men in the constant jeopardy of being run out of business. This argument, however, is very weak in comparison to the opposite result of 'leaving the patient to pay.' Strict liability has not made small food dealers extinct, but has forced all food retailers to exert the highest duty of care expected of them. Thus, placing a similar strict liability on the retail druggist will likewise urge him to exercise the highest duty of care commensurate with his superior knowledge and justify the trust placed in him by the public." (Schmitz, *Retail Druggist's Warranty of Drugs* (1966) 15 Clev.-Mar. L.Rev. 285, 291, fns. omitted.)

For all the reasons articulated above, retail druggists and pharmacies should be strictly liable for the sale of defective prescription drugs. The injured consumer should not assume that burden. The judgment on the pleadings in favor of defendant Exclusive should be reversed.

Kaus, J.,* and Broussard, J., concurred.

**KAUS, J.**—I respectfully dissent.

On the question of whether a retail pharmacist may be held strictly liable for the sale of a defective prescription drug, I agree with the conclusions of the Chief Justice and have signed her separate dissenting opinion. Unless we are to repudiate the principle set forth by Chief Justice Traynor in *Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 262-263 [37 Cal.Rptr. 896, 391 P.2d 168], applying strict liability doctrine to retailers of goods generally (see also Rest.2d Torts, § 402A, com. f), if a manufacturer who markets a defective prescription drug may be held strictly liable for resulting injuries, I see no proper basis for exempting a retail pharmacist—certainly

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

a link in the product's marketing chain—from similar liability.[1] It is surely no more difficult for such a pharmacist to obtain contractual or equitable indemnity from the manufacturer, or to insure against such loss in his own right, than it is for the typical "mom-and-pop" grocery or hardware store to take such steps. While Justice Grodin is correct in noting that doctors and dentists have not been held strictly liable for injuries caused by defective products which they incidentally use in performing their service on patients (*ante,* p. 685 (conc. opn. of Grodin, J.)), I know of no authority which suggests that *the retailer* who sells a doctor or dentist a defective surgical needle or defective orthodontic wire should escape strict liability for a resulting injury to the patient simply because the defective product has been used in the course of a professional service.

I also disagree with the majority's conclusion on the separate issue of whether plaintiff has stated a cause of action against the drug manufacturer under the "market share" doctrine set forth in *Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061]. Although I recognize that *Sindell* purported to qualify the application of the market share doctrine by the requirement that plaintiff join the manufacturers of a "substantial share" of the stilbestrol (DES) market (26 Cal.3d at p. 612), frankly I never could see how that qualification can logically be squared with the decision's general market share theory.[2] As I understand the market share concept, under that doctrine—in contrast, for example, to the doctrine of *Summers* v. *Tice* (1948) 33 Cal.2d 80 [199 P.2d 1, 5 A.L.R.2d 91] or *Ybarra* v. *Spangard* (1944) 25 Cal.2d 486 [154 Cal.Rptr. 687, 162 A.L.R. 1258]—each manufacturer can only be held liable *for that proportion of the plaintiff's damages which equals the particular manufacturer's market share of the DES that was manufactured and sold. (Sindell, supra,* 26 Cal.3d at p. 612.) Because the manufacturer's liability is limited in this fashion, I do not see how a particular manufacturer is harmed by the plaintiff's failure to join more manufacturers in the lawsuit; any particular defendant bears the same liability no matter how many or how few other manufacturers are joined. Thus, I do not think a plaintiff should be deprived of the limited recovery which *Sindell* allows against a

---

[1] I emphasize that the retailer's liability should simply be coextensive with that of the drug manufacturer. If—for reasons not fully explored in existing California cases—it is determined that, in a particular context, a drug manufacturer should not be held strictly liable for harm caused by a prescription drug, the retailer too should escape strict liability. But when the manufacturer may properly be held strictly liable—as would clearly be the case, for example, if it marketed an impure batch of a prescription drug—the retailer of the defective drug should also be strictly liable.

[2] At least one academic commentator, who strongly supports the imposition of tort liability on a market share theory, has expressed similar misgivings about *Sindell*'s "substantial share" of the market requirement. (See Robinson, *Multiple Causation in Tort Law: Reflections on the DES Cases* (1982) 68 Va.L.Rev. 713, 725-726.)

particular manufacturer simply because, for one reason or another, she has not been able to amass the manufacturers of a "substantial share" of the DES drug.