# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-CT-01228-SCT

*RICHARD (RICKEY) PALERMO AND SHELIA
PALERMO*

*v.*

*LIFELINK FOUNDATION, INC. d/b/a LIFELINK
TISSUE BANK*

## ON WRIT OF CERTIORARI

DATE OF JUDGMENT:              12/20/2011
TRIAL JUDGE:                   HON. JEFF WEILL, SR.
COURT FROM WHICH APPEALED:     HINDS COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANTS:      DAVID NEIL McCARTY
                               FRANK G. VOLLOR
                               ALLEN AUSTIN VOLLOR
ATTORNEYS FOR APPELLEE:        CHRISTY VINSON MALATESTA
                               JOHN ALFRED WAITS
                               MARK C. CARLSON
NATURE OF THE CASE:            CIVIL - MEDICAL MALPRACTICE
DISPOSITION:                   AFFIRMED - 11/20/2014
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**KING, JUSTICE, FOR THE COURT:**

¶1.     Richard Palermo alleged that he was injured by infected tissue surgically placed into

his knee.  He sued LifeLink Foundation, Inc., under, *inter alia*, the Mississippi Products

Liability Act ("MPLA"), Mississippi Code Section 11-1-63.  The trial court and Court of

Appeals both found that Mississippi Code Section 41-41-1, which defines the procurement,

processing, storage, distribution, and use of human tissue as a "service," exempted LifeLink

from liability under the MPLA. While we clarify the analysis surrounding this issue, we

ultimately find no error, and thus affirm the trial court and the Court of Appeals.

## FACTS AND PROCEDURAL HISTORY

¶2.     The recitation of facts is taken largely from the Court of Appeals opinion.

> On March 2, 2005, Richard injured his right knee while working as an
> employee for Letourneau Technologies Inc. Richard sought treatment from
> Dr. Gene Barrett, an orthopedic surgeon at Mississippi Baptist Medical Center
> (MBMC). Dr. Barrett recommended surgery described as "anterior cruciate
> ligament construction and medical meniscus repair and the use of an allograft."
>
> On March 22, 2005, LifeLink, a non-profit tissue bank, filled an order
> placed by Nu[T]ech Medical Inc. ("NuTech") for a tibialis tendon-anterior
> allograft. Prior to LifeLink's shipment of the allograft, it was tested and there
> were no findings of sepsis or medical infection in the medical history or
> autopsy of the allograft donor. LifeLink shipped the allograft to Nu[T]ech,
> where it remained for six days. On March 28, 2005, Nu[T]ech shipped the
> allograft to Medical Arts East Physician Surgery Center in Jackson,
> Mississippi. Dr. Barrett performed Richard's surgery with the allograft on
> April 5, 2005. After the surgery, Richard's knee began to exhibit signs of
> infection. Dr. Barrett removed the allograft from Richard's knee on May 11,
> 2005, and the infection subsided. After the allograft was removed from
> Richard's knee on May 11, 2005, further testing was done on the allograft. It
> showed that no bacteria was present.
>
> The Palermos filed their first complaint in this action on March 7, 2007,
> against numerous defendants, including MBMC, Dr. Barrett, NuTech, and
> LifeLink. After the dismissal of several defendants, the Palermos filed a First
> Amended and Supplemental Complaint against LifeLink on March 16, 2010.
>
> . . .
>
> LifeLink moved for summary judgment on August 9, 2011. . . . On
> December 20, 2011, the trial court granted summary judgment in favor of
> LifeLink. In its opinion and order, the court determined that Mississippi's
> public health statute, Mississippi Code Section 41-41-1 (Rev. 2013), also
> applied to human tissue and therefore prohibited the Palermos' claims brought
> under the Mississippi Products Liability Act as codified in Mississippi Code

2

Annotated [S]ection 11-1-63 (Rev. 2012) - strict products liability, products liability negligence, and breach of warranty. The court also stated that, because the Palermos failed to prove the elements of breach of duty or causation, they could not prove a case of simple negligence.

On appeal [to the Court of Appeals], the Palermos argue[d] the following issues: (1) the trial judge committed reversible error in granting LifeLink's motion for summary judgment, (2) the trial judge abused his discretion in denying the Palermos' supplementary expert designation of Dr. Marion Kainer, and (3) the trial judge abused his discretion in denying the Palermos' request for a court reporter to transcribe the hearing on summary judgment. . . .

*Palermo v. LifeLink Foundation, Inc.*, 2012-CA-01228-COA, 2014 WL 114531, at **1-2

(Miss. Ct. App. Jan. 14, 2014).

¶3. The Court of Appeals affirmed the trial court. It noted that the question of whether "section 41-41-1 [is] an exception to section 11-1-63" or whether "section 11-1-63 [is] an exception to section 41-41-1" was a matter of first impression. *Id.* at *3. It ultimately found that "[s]trict-products-liability protection is not provided for the distribution of human tissue for medical procedures under the public policy of Mississippi underlying section 41-41-1, as well as the strong nationwide public policy established against such liability in statutes and case law in the overwhelming majority of other states." *Id.* at *4. It also found that "human tissue provided to others in medical procedures is not a 'product' subject to products-liability law, and the distribution of human tissue, including reasonable payments for related services, does not constitute a 'sale' for purposes of strict liability." *Id.* The Court of Appeals also held that the trial court did not err in granting LifeLink's motion for summary judgment in regard to the Palermos' simple negligence claim, that the trial court did not abuse its discretion in excluding one of the Palmeros' experts, and that the denial of the Palermos'

3

motion for a court reporter was harmless error. *Id.* at \*\*4-6.

¶4.     The Palermos filed a petition for writ of certiorari, as well as a supplemental brief thereto, with this Court. They argued that the Court of Appeals erred by finding that Section 41-41-1 excepted LifeLink from the purview of the MPLA, that whether the allograft was contaminated with bacteria is a question of material fact that the Court of Appeals misapprehended, and that the denial of a court reporter was a violation of due process. Because Section 41-41-1 has never been interpreted by this Court, and because the issue of whether human tissue is subject to products liability law is a "fundamental issue[] of broad public importance requiring determination by the Supreme Court," we granted certiorari. M.R.A.P. 17(a)(3)(ii). We limit our review to the issue of whether the MPLA, Mississippi Code Section 11-1-63, applies to human tissue in this circumstance, especially in light of the rule pronounced by Mississippi Code Section 41-41-1. *See **Guice v. State***, 952 So. 2d 129, 133 (Miss. 2007) (Supreme Court "unquestionably" has the authority to limit the issues on review).

## ANALYSIS

¶5.     We review a trial court's grant of summary judgment de novo. ***Seymour v. Brunswick Corp.***, 655 So. 2d 892, 894 (Miss. 1995). "A motion for summary judgment lies only when there is no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law." *Id.* at 895. Further, when the question before the trial court was a question of law, our standard of review is de novo. *Id.*

¶6.     The crux of the Palermos' several arguments is that, under Mississippi law, plaintiffs have a viable strict products liability claim with regard to human tissue. They essentially

4

argue that Section 41-41-1 and the MPLA have no bearing on one another. For the reasons explained below, the Palermos' arguments have no merit.

¶7.     In July 1966, this Court first held that, under common law, strict products liability was a viable cause of action. *State Stove Mfg. Co. v. Hodges*, 189 So. 2d 113 (Miss. 1966), *superseded by statute*, Miss. Code Ann. § 11-1-63. In eliminating privity of contract as a requirement for suing the manufacturer or seller of a product, the Court examined both the national and local legal landscape. It noted that the doctrine of privity of contract, which was, in 1966, "now universally rejected," began in 1842, and courts immediately began eroding the concept. *Id.* at 115-16. The "most important exception" to privity of contract was created in 1916, and made a seller liable based "upon the relation arising from the *purchase*, together with the foreseeability of harm if proper care was not used" rather than that arising from contract. *Id.* (emphasis added). As to this exception to privity of contract, the Court noted Prosser's analysis in his 1964 edition of *Torts*, quoting him as saying that the exception "found immediate acceptance, and at the end of some forty years is universal law in the United States, with the barely possible but highly unlikely exception of Mississippi." *Id.* at 116 (quoting Prosser, *Torts* 661-63 (3d ed. 1964)). The Court thus noted that "[p]rivity of contract between a consumer of a product and its manufacturer has not only been abandoned by every State in the Union, except Mississippi, but it has no rational basis for continuance in such an action in this jurisdiction." *State Stove*, 189 So. 2d at 116.

¶8.     The Court abolished the requirement of privity of contract in a suit by a consumer against a manufacturer and held that a "manufacturer, by placing a chattel or product upon the market, assumes a responsibility to the consumer, resting not upon the contract but upon

5

the relation arising from his *purchase*, together with the foreseeability of harm if proper [care] is not used." ***Id.*** (emphasis added). The Court then noted that "in several cases beginning in 1954, this Court expressly pretermitted the question of whether privity was necessary in a suit against a manufacturer, *but indicated that requirement might be rejected*." ***Id.*** (emphasis added). Indeed, it opined that all the cases "rendered caveats to the applicability of [the] doctrine [of privity of contract in a suit by a consumer against a manufacturer] in Mississippi." ***Id.*** at 118. The Court analyzed several cases that indicated that, when the proper case was before the Court, it would eliminate the requirement of privity of contract. ***Id.*** at 116-18. It also highlighted a 1927 case that established that "privity of contract is not an essential part of a cause of action against a manufacturer" in food and beverage cases. ***Id.*** at 117-18 (citing **Coca-Cola Bottling Works v. Lyons**, 111 So. 305 (Miss. 1927)). Thus, the Court made clear that caselaw had previously indicated that its holding in **State Stove** was inevitable. Moreover, the Court indicated that liability existed due to the relationship arising from the purchase (and consequently, the sale) of a product. It went on to adopt the standard contained in the Restatement (Second) of Torts, which explicitly conditioned the viability of strict liability claims on the presence of a sale. **State Stove**, 189 So. 2d at 118 (quoting *Restatement (Second) of Torts* § 402A ("One who *sells* any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property. . . .") (emphasis added) (Comment d provides that the rule "extends to any product *sold* in the condition . . . in which it is expected to reach the ultimate user or consumer.") (comments repeatedly refer to a sale as a necessary predicate for strict

6

products liability)).

¶9.     In May of 1966, the Legislature passed the blood banking statute. 1966 Miss. Laws,

Ch. 475, § 1; *see* Miss. Code Ann. §41-41-1 (Rev. 2013). The law provided that

> [t]he procurement, processing, storage, distribution and/or use of whole blood,
> plasma, blood products, and blood derivatives for the purpose of injecting or
> transfusing, transplanting the same or any of them into the human body for all
> purposes whatsoever is the rendering of a service by every person participating
> therein, . . . and does not constitute a sale.

1966 Miss. Laws, Ch. 475, § 1. This statute and others of its ilk are often coined "blood

shield" statutes. The historical legal landscape surrounding the enactment of these statutes

is pertinent to the Palermos' argument that this statute has nothing to do with the MPLA.

> The statutory and common law protection of the suppliers of blood and blood
> products from strict liability and breach of warranty claims developed during
> the mid 60's through early 70's in response to the transmission of the hepatitis
> virus by blood and blood products. . . . States feared that the threat of liability
> without fault would drive the suppliers out of the very necessary business of
> providing blood.

*Doe v. Travenol Labs., Inc.*, 698 F. Supp. 780, 782 (D. Minn. 1988) (citing Comment,

*Hospital and Blood Banks Liability to Patients Who Contract AIDS through Blood*

*Transfusion*, 23 San Diego L. Rev. 875, 883 (1986)). While Section 41-41-1 has never been

interpreted by this Court, it has been widely regarded as a "blood shield" statute, along with

similar statutes passed by other states. *See* Michael J. Miller, Note, *Strict Liability,*

*Negligence and the Standard of Care for Transfusion-Transmitted Disease*, 36 Ariz. L. Rev.

473, 488-490 (1994) ("In 48 states the common law of liability for diseases transmitted by

blood no longer applies because the legislatures have passed statutes to protect hospitals and

blood banks from strict liability. The exceptions are New Jersey, and Vermont.") ("The

7

majority of these statutes . . . specify that blood is a [service] and not a [sale]. The majority of the statutes also either specify that negligence is the only theory available, or specifically exclude both strict products liability and implied warranty theories. . . . Eight states [including Mississippi] do not mention any theory specifically, but rather rely on the sales/service distinction."); Salbu, Steven R., *AIDS and the Blood Supply: An Analysis of Law, Regulation, and Public Policy*, 74 Wash. U. L.Q. 913, 923 (1996) ("Most statues define the distribution of blood and blood components as a provision of services rather than a sale of products, effectively removing them from the scope of strict liability and warranty actions. . . ."); McIntosh, Phillip L., *Tort Reform in Mississippi: An Appraisal of the New Law of Products Liability, Part I*, 16 Miss. C. L. Rev. 393, 410 (1996) ("Processing and distributing blood and blood products are clearly outside the scope of products liability rules because the legislature has designated such activities as services, not sales.").

¶10.    Given the historical context when the Legislature passed Section 41-41-1, and the fact that the common law and Restatement (Second) of Torts predicated strict products liability in tort on the existence of a sale, the logical conclusion is that, in passing Section 41-41-1, the Legislature intended to exempt blood from strict products liability law. *See, e.g.,* **Wilson v. Am. Red Cross**, 600 So. 2d 216, 217-18 (Ala. 1992) (interpreting a similar statute and finding that the language "for all purposes" means that the Legislature intended the statute "to be applicable for all purposes, including negligence actions, breach of contract actions and" strict liability actions); **Murphy v. E. R. Squibb & Sons, Inc.**, 710 P.2d 247, 252 (Cal. 1985) (noting that the purpose of a similar statute that defined the distribution or use of blood as a service and not a sale "is to avoid application of the doctrine of strict liability . . . thereby

8

promoting the constant availability of an adequate supply of blood"); *Condos v. Musculoskeletal Transplant Foundation*, 208 F. Supp. 2d 1226 (D. Utah 2002) (interpreting a similar statue and common law strict liability, and finding that human bone tissue is not a "product" and the distribution of such is not a "sale" for purposes of strict products liability); *Royer v. Miles Lab., Inc.*, 811 P.2d 644 (Or. Ct. App. 1991) (interpreting a similar statute, and noting that "[i]n 1969, when the statute was enacted, what liability there was for injuries caused by defective products was based on concepts relating to contractual warranties[,]" but that "[s]trict liability in a tort action . . . was at the infant stage") (Reviewing legislative history and finding that "[t]he context in which the statute was enacted helps explain why strict liability was not mentioned expressly . . . . At that time, the courts had just created strict liability, and it was seen as an offshoot of warranty law . . ." and concluding that "[b]ecause strict liability cannot arise without there having been a sale, defendants could not be strictly liable.").

¶11.    Section 41-41-1 was amended in 1975 and again in 1980, and the only substantive changes made pertained to the "shelf-life" of blood, a portion of the statute irrelevant to today's case.  In 1987, the Legislature amended Section 41-41-1 to include in its purview "human tissue, organs or bones," and Section 41-41-1 has since remained unchanged.  1987 Miss. Laws, Ch. 401, § 1.  In its present form, Section 41-41-1 provides that

> The procurement, processing, storage, distribution and/or use of whole blood, plasma, blood products and blood derivatives, human tissue, organs or bones for the purpose of injecting, transfusing, transplanting or transferring the same or any of them into the human body for all purposes whatsoever constitutes the rendering of a service by every person participating therein, whether or not any remuneration is paid therefore, and does not constitute a sale. . . .

9

Miss. Code Ann. § 41-41-1 (Rev. 2013).

¶12.    In 1993, the Legislature codified strict products liability.[1] 1993 Miss. Laws, Ch. 302, § 1.  In doing so, it provided for strict liability claims against a "manufacturer" or a "seller." *Id.*; *see also* Miss. Code Ann. § 11-1-63 (Rev. 2014).  When the Legislature passed the MPLA, it did so with the knowledge that, "for all purposes whatsoever," it had statutorily defined people involved in blood procurement, processing, storage, distribution, and/or use as service providers, and that this definition as a service provider "for all purposes whatsoever" had been the law for twenty-seven years.  It also passed the MPLA with the full knowledge that people involved in the procurement, processing, storage, distribution, and/or use of human tissue were statutorily defined as service providers, and had been for six years.  Yet, in passing the products liability law, the Legislature chose only to apply strict products liability to "manufacturers" and "sellers," and did not include service providers in its purview.[2]

¶13.    This Court does not "decide what a statute should provide, but [] determine[s] what it does provide."  *Lawson v. Honeywell Intern., Inc.*, 75 So. 3d 1024, 1027 (Miss. 2011).  "The Court's goal is to give effect to the intent of the Legislature."  *Id.*  To determine that

---

[1]Even though common law strict liability "is no longer the authority on the necessary elements of a products liability action" due to the adoption of the MPLA, the common law principles "are a driving force in products liability actions even after adoption of the statute." *Huff v. Shopsmith, Inc.*, 786 So. 2d 383, 387 (Miss. 2001); *see also* *Williams v. Bennett*, 921 So. 2d 1269, 1274 (Miss. 2006) ("Similar to its common law predecessor, today's statutory scheme reflects the same tenor as the common law scheme adopted from the Restatement (Second) of Torts by this Court in *State Stove*.").

[2]In 2014, the Legislature amended the MPLA to include "designers."  2014 Miss. Laws Ch. 383, § 1.

intent, this Court looks first to the language of the statute. *Id.* "If the words of a statute are clear and unambiguous, the Court applies the plain meaning of the statute and refrains from using principles of statutory construction." *Id.* Furthermore, words and phrases contained in a statute are to be given their common and ordinary meaning. *Id.* at 1028. "Manufacturer" and "seller" are not defined by the MPLA, thus, this Court applies their common or popular meaning. Black's Law Dictionary defines a "seller" as "a person who sells anything." *Black's Law Dictionary* (9th ed. 2009). Section 41-41-1 explicitly provides that those involved in the processing of human tissues are not selling anything, but providing a service, thus, they are clearly not "sellers" under the MPLA. This Court has defined "manufacturer" for strict liability purposes as "a person or company who regularly and in the course of their principal business, creates, assembles and/or prepares goods for sale to the consuming public." *Lawson*, 75 So. 3d at 1028 (quoting **Scordino v. Hopeman Bros., Inc.**, 662 So. 2d 640, 645 (Miss. 1995)) (internal quotations and alterations omitted). It has also noted that "a manufacturer produces goods as a principal part of its business and sells them either directly or for resale to the consuming public." *Lawson*, 75 So. 3d at 1029 (quoting *Scordino*, 662 So. 2d at 645) (internal quotations and alterations omitted). In contrast, Black's Law Dictionary defines a "service" as "[t]he act of doing something useful for a person or company," "[a] person or company whose business is to do useful things for others," and "[a]n intangible commodity in the form of human effort, such as labor, skill, or advice." *Black's Law Dictionary* (9th ed. 2009).

¶14.    A service provider does not "produce" a good for sale. *See Lawson*, 75 So. 3d at 1029. "*Black's Law Dictionary* defines 'produce' as 'to bring into existence' or 'to create.'"

11

*Id.* (quoting *Black's Law Dictionary* 1245 (8th ed. 2004)). This Court has indicated that "the manufacturer of a good is the person or company who brings the good into its tangible form." *Lawson*, 75 So. 3d at 1029. When a company, by statutory definition, provides a service by doing something useful for others, it is not, because of that statutory definition, functioning as a "manufacturer" under the definitions of "manufacturer" provided by this Court.[3] *See id.* Thus, a mere service provider "does not fall under the definition of a 'manufacturer,' as that term is used in the MPLA." *Id.* "The Legislature did not state that the MPLA applies to, or precludes, claims against [service providers]. Holding that the MPLA is applicable to such claims would constitute an improper addition to the statute, since [service providers] plainly are omitted." *Id.* at 1030.

¶15. The historical context of Section 41-41-1 indicates that the Legislature intended to exempt "every person participating" in the "procurement, processing, storage, distribution, and/or use" of "whole blood, plasma, blood products and blood derivatives, human tissue, organs or bones for the purpose of injecting, transfusing, transplanting or transferring the same or any of them into the human body" from liability under the theory of strict products liability. Nothing in the MPLA indicates that the Legislature intended to change that long-standing concept. Moreover, even absent the historical context regarding the interplay of Section 41-41-1 and strict liability law, the plain language of the MPLA makes clear that it does not apply to mere service providers. In this circumstance, LifeLink is statutorily

---

[3]We recognize that some of the actions performed by people who fall under the purview of Section 41-41-1 are not traditional or common "services." However, the fact that those people are statutorily defined, "for all purposes whatsoever" as providing a service overrides any traditional notions of what a service is in this circumstance.

12

defined as a service provider. Thus, the trial court did not err by granting LifeLink's motion for summary judgment on the Palermos' product liability claim, nor did the Court of Appeals err by affirming the trial court's judgment.

¶16. **AFFIRMED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, CHANDLER, PIERCE AND COLEMAN, JJ., CONCUR.**