# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00607-COA

**CHESTER SHORT AND JLS FARM PARTNERSHIP**
          **APPELLANTS**

**v.**

**DR. SAM POLLES, IN HIS OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF THE MISSISSIPPI DEPARTMENT OF WILDLIFE, FISHERIES AND PARKS AND THE MISSISSIPPI DEPARTMENT OF WILDLIFE, FISHERIES AND PARKS**
          **APPELLEES**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/26/2023 |
| TRIAL JUDGE: | HON. JESS H. DICKINSON |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANTS: | SAMUEL L. BEGLEY PHILIP W. GAINES |
| ATTORNEYS FOR APPELLEES: | ALAN M. PURDIE T. HUNT COLE JR. DOUGLAS DREW MALONE SAMUEL PHILIP GOFF |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED - 04/08/2025 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**McCARTY, J., FOR THE COURT:**

¶1.    A farmer received an animal control permit from an agency to rid his fields of deer eating his soybean crops. The permit was later revoked due to high water conditions. The farmer then sought and received a second permit, but the agency imposed a limitation that he could kill "does only."

¶2.    The farmer chose not to use this second permit. Instead, he sued the agency. He claimed the revocation of the first permit and the "does only" limitation in the second were arbitrary and capricious. The trial court determined that the permit decisions were within the agency's power, so the agency was immune from liability. The farmer's complaint was dismissed with prejudice. After review, we affirm the trial court's dismissal.

**FACTS AND PROCEDURAL HISTORY**

¶3.    Chester Short is a soybean farmer in the Mississippi Delta. In 2017, Short leased three adjacent tracts of land in Washington and Bolivar Counties for farming operations, as he had done for the past 17 years.[1] His farmland is located along the Mississippi River and borders a levee, heavily wooded property, and two hunting clubs.[2] The land between the River and

---

[1] The trial judge described Short as "operating through JLS Farm Partnership," which is a farming company he used, and we draw no distinction.

[2] Two deer hunting clubs, "27 Break" and "Black Bayou Hunting Club" were inside the Mississippi River levee and owned property close to Short's farming land. Short filed two other separate unsuccessful lawsuits against the hunting clubs, which are interrelated to the present appeal.

We addressed his first action in *Short v. Break Land Co. LLC*, No. 2022-CA-01180-COA, 2024 WL 4354694 (Miss. Ct. App. Oct. 1, 2024), *reh'g denied* (Miss. Ct. App. Feb. 11, 2025), *petition for cert. filed* (Miss. Mar. 11, 2025), where Short sued Break Land Company, raising claims related to the suspension or revocation of the Shorts' membership with the Break Hunting Club. *Id*. at *1 (¶2) This Court affirmed the dismissal of the complaint, finding he failed to allege any actionable claims. *Id*. at *8 (¶31).

In the second appeal, *JLS Farm P'ship v. '27 Break Hunting Club Inc.*, No. 2023-CA-00434-COA, 2025 WL 312500 (Miss. Ct. App. Jan. 28, 2025), *mot. for reh'g filed* (Miss. Ct. App. Feb. 25, 2025), Short sued '27 Break Hunting Club for issues related to a lease agreement between Short and the owners of the hunting land. *Id*. at *1 (¶1). This Court affirmed the trial court's grant of summary judgment in favor of '27 Break Hunting Club, finding that the deposition excerpts, pleadings, and other documents failed to show a genuine issue of material fact. *Id*. at *7 (¶32).

2

the levee is inhabited by a large population of deer.

¶4.	In early April 2017, Short planted soybeans on each of his fields. As the crops started to grow, deer came along and ate the emerging stems and leaves. This resulted in Short replanting soybeans at the end of April and again in May 2017.

¶5.	At the end of May, because of the pattern and severity of damage to his soybean fields, Short filed an application with the Mississippi Department of Wildlife, Fisheries and Parks requesting a permit to kill the deer eating his crops. MDWFP issued him a thirty-day animal control permit on May 22, 2017, giving him the opportunity to kill an unlimited quantity of deer in his fields.

¶6.	Over the next couple of days, Colonel Steve Adcock, MDWFP's chief enforcement officer, received complaints from "people calling in about deer being shot" and "piled up all along the road" by Short's property. Colonel Adcock sent officers to inspect Short's property on May 29, 2017. The officers discovered numerous decomposing deer carcasses scattered throughout the crop fields but did not see any deer piled up on the roadway.

¶7.	The officers instructed Short to fill out a follow-up report, which was then submitted to Colonel Adcock. In the report, Short recounted observing about 175 deer in his fields on the first night and about 200 deer again the second night. He further reported killing 10 deer the first night and another 10 or 11 deer the second night.

¶8.	Colonel Adcock became alarmed when he read the report and learned of the unusually large number of deer observed on Short's land. He became concerned that "[e]ither the

3

permit holder greatly exaggerated what he was seeing, or we had something else causing that many deer to be in that field." Based on his suspicions, Colonel Adcock obtained the exact location of Short's farmland, "pulled the GPS coordinates and pulled it up on the map[.]" He learned "it was right across the levee from the Mississippi River." Then using the longitude and latitude coordinates of the property, he researched the gauges along the River and found that the Greenville, Mississippi gauge was closest in proximity to Short's farm. Colonel Adcock reviewed the data from the Greenville gauge and discovered that the River level was above flood stage at that time and had been for over two weeks. He concluded that the area near Short's farmland was experiencing a "major flood event and that basically is what pushed those deer out."

¶9.     After making this discovery, Colonel Adcock found it necessary to enforce a high-water statute that made it unlawful to kill animals forced out of their natural habitat by high water conditions. Consequently, he had Short's animal control permit revoked on May 30, 2017. That same day, MDWFP officers informed Short that he was not allowed to shoot any more deer, though the officer did not give him a reason for this order. Short did not hear anything further from the agency about his animal control permit.

¶10.    On June 16, 2017, Short filed a complaint against MDWFP requesting a temporary restraining order on the agency's revocation of his animal control permit. His complaint also sought a preliminary and permanent injunction. The chancery court granted a temporary restraining order that same day, temporarily restraining and enjoining MDWFP from

4

suspending or terminating Short's permit. The injunction was set for a hearing two weeks later. At the hearing, counsel informed the chancellor that the parties had reached a temporary resolution of the matter.[3]

¶11. Under their agreement, Short would be allowed to re-apply for an animal control permit.[4] But Short would be required to fill out separate applications for each of the three leased tracts of land, instead of just one all-encompassing application like he previously filled out for the first permit. He was also told he had to get the applications signed by the owners of each leased tract of land to show he had their permission.

¶12. Short succeeded in getting the owners of two of the tracts to sign off on his application. However, the owner of the third tract refused to sign in agreement after receiving numerous complaints from nearby hunting club members concerned about Short's actions when he had the first permit. Short submitted both of the signed applications. In turn, MDWFP issued him two animal control permits, but this second set of permits contained two restrictions: "permit for 2 weeks" and "does only."[5]

---

[3] As of June 2017, Short's complaint for an injunction remained pending in the Hinds County Chancery Court. But in September 2017, MDWFP and Dr. Polles moved to transfer venue to the circuit court or dismiss.

[4] Therefore, the chancery court did not have an opportunity to rule on the merits of Short's request for a preliminary and permanent injunction.

[5] Notably, the permit also contains the same form language as the first round that states, "This permit will be issued for one (1) month[.]" But below that statement, there is a "Restrictions" section that was filled out by the department to include the time limit and does only notation.

¶13. Although Short was granted these two animal control permits, he chose not to use them and did not report killing any more deer in his fields. According to Short, the second set of permits was useless since he could not rid his fields of bucks too. He also believed the permit limitations put him at risk for criminal consequences because it was difficult to distinguish does and bucks at night.

¶14. Frustrated by the application requirements and permit limitations, Short took legal action against MDWFP and its executive director, Dr. Sam Polles.

¶15. In December 2017, Short filed his second amended complaint in the Hinds County Chancery Court. He asserted eight claims for relief in the lower court. Counts I and II were due process claims alleging violations of his right to protect his property by revocation and limitation of permits; counts III and IV requested declaratory judgments for a wildlife statute used to revoke his permit and for permit application procedures; and count V was a tort claim seeking compensatory damages for MDWFP's actions related to animal control permits.[6] The Department then filed a motion to dismiss or to transfer the second amended complaint to circuit court.

¶16. Seven months later, the chancery court entered an order transferring the case to the Hinds County Circuit Court, First Judicial District. The case was assigned to a circuit judge over three-and-a-half years later in January 2022, and a bench trial was finally held in

---

[6] Counts VI, VII, and VIII asserted in Short's second amended complaint are claims related to private actors, which are not relevant for the purposes of this appeal.

October 2022. Subsequently, on the trial judge's instructions, the parties each submitted their proposed findings of fact and conclusions of law.

¶17. In April 2023, the trial court entered an order with its findings of fact and conclusions of law and a separate order of its final judgment. The trial judge determined that each of Short's claims arose from and were related to permits from MDWFP that were within the agency's discretion to issue and revoke. Accordingly, the agency was found immune from liability for Short's tort claims under the permitting exemption and discretionary-function exemptions. Therefore, the trial court ruled in favor of MDWFP and Dr. Polles and dismissed Short's complaint with prejudice.

¶18. Aggrieved, Short appeals the trial court's order of dismissal.

## STANDARD OF REVIEW

¶19. "Cases brought under the tort claims act are subject to a bench trial, with the judge sitting as both the finder of fact and law." *Phillips v. City of Oxford*, 368 So. 3d 317, 323 (¶21) (Miss. 2023) (citing Miss. Code Ann. § 11-46-13(1) (Rev. 2019)). The trial judge's "determination that a governmental entity is immune under the MTCA is de novo." *Towns v. Panola Cnty. Bd. of Supervisors*, 357 So. 3d 1062, 1070 (¶18) (Miss. Ct. App. 2022) (quoting *Smith ex rel. Smith v. Leake Cnty. Sch. Dist.*, 195 So. 3d 771, 774 (¶8) (Miss. 2016)). But the court's factual findings will not be disturbed "following a bench trial unless the findings 'are manifestly wrong, clearly erroneous, or an erroneous legal standard was applied.'" *Id*. at 1070 (¶17) (quoting *Miss. Dep't of Wildlife, Fisheries & Parks v. Webb*, 248

7

So. 3d 772, 776 (¶4) (Miss. 2018)).

## DISCUSSION

¶20.    On appeal, Short claims the trial court erred (a) by finding that the revocation of his first permit was required by the high-water statute and was not arbitrary and capricious; (b) by finding Colonel Adcock's "does only" restriction was not arbitrary and capricious; (c) by applying the discretionary-function immunity exemption to his claims; and (d) by not finding a violation of his rights to due process and to protect his property based on the revocation and restriction of his animal control permits.

¶21.    While Short asserts a myriad of arguments on appeal, they all focus on the permitting process and center around MDWFP's revocation and limitation of his animal control permits. Short's primary argument insists the Department should not have withdrawn his original permit based on the water level of the Mississippi River, nor should it have limited his second permit to "does only," rendering the permit "useless." Ultimately, Short's claims are dependent on whether MDWFP's actions were arbitrary and capricious.

¶22.    "[A]rbitrary and capricious" has been defined as the "characterization of a decision or action taken by an administrative agency or inferior court meaning willful and unreasonable action without consideration or in disregard of facts or law or without determining principle.'" *Lowe v. Lowndes Cnty. Bldg. Inspection Dep't*, 760 So. 2d 711, 713 (¶10) (Miss. 2000) (quoting *Arbitrary and capricious*, Black's Law Dictionary 105 (6th ed. 1990)). A decision that "is supported by substantial evidence cannot be arbitrary and

8

capricious." *Titan Tire of Natchez Inc. v. Miss. Comm'n on Env't Quality*, 891 So. 2d 195, 201 (¶19) (Miss. 2004) (internal quotation marks omitted).

¶23.    As for the practical application, "[a]n administrative act is arbitrary and capricious if the agency 'entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of any agency expertise.'" *City of Tupelo v. McMillin*, 192 So. 3d 948, 954-55 (¶20) (Miss. 2016) (quoting *Lowe*, 760 So. 2d at 714 (¶12)). Furthermore, an act may be deemed "per se arbitrary and capricious" where the conduct is based on "the failure of an agency to abide by its rules[.]" *Id*. (quoting *Lowe*, 760 So. 2d at 714 (¶12)).

> **I.      Revoking the first permit due to high water conditions was not arbitrary and capricious.**

¶24.    Short claims the Department's actions were arbitrary and capricious because Colonel Adcock revoked his original permit based on the "irrelevant factor" of "the high water provision found in Section 49-7-77[.]" In particular, Short alleges the statute establishing animal control permits[7] is a "mandatory directive" to issue permits to farmers and "is not subject to the high-water provision."

¶25.    Our Legislature has expressed that "[h]unting, trapping and fishing are vital parts of the heritage of the State of Mississippi." Miss. Code Ann. § 49-7-1.1 (Rev. 2012). As such,

---

[7] Miss. Code Ann. § 49-1-39 (Rev. 2012).

"[i]t is, and shall be, the public policy of this state to promote hunting, trapping and fishing and other outdoor recreational opportunities and to preserve these activities for all generations to come." *Id*.

¶26.    Based on these principles, the Legislature created the Mississippi Department of Wildlife, Fisheries and Parks. Miss. Code Ann. § 49-4-1 (Rev. 2012). The Legislature invested MDWFP with the "powers and duties . . . [t]o conserve, manage, develop and protect the wildlife of the State of Mississippi." Miss. Code Ann. § 49-4-8(a) (Rev. 2012). The Legislature granted the agency the authority to "regulate hunting, trapping and fishing activities in the State of Mississippi." *Id*. § 49-7-1.1.

¶27.    The way MDWFP regulates these activities is through permits and licenses. Our Legislature instructed that MDWFP "*shall* have the power and authority to issue *all* licenses and permits under the jurisdiction of the department." Miss. Code Ann. § 49-4-4(6) (Supp. 2024) (emphasis added). This includes "powers . . . [to] [p]rescribe the form and type . . . ." Miss. Code Ann. § 49-4-39(2)(a) (Supp. 2023).

¶28.    Pursuant to section 49-1-39, the statute governing animal control permits, the MDWFP "may issue permits to kill any species of animals . . . which may become injurious to agricultural or other interests in any particular community."[8]

---

[8] The trial court's order and both parties' appellate briefs also reference section 49-7-31(4), titled "Open season on deer," which provides that MDWFP "may provide a special permit for the *harvesting* of deer when they are depredating and destroying crops. The department shall supervise the *harvesting* and provide for the *salvaging of the meat* of the animals." Miss. Code Ann. § 49-7-31(4) (Supp. 2025) (emphasis added). Because the

10

¶29. Looking at the language of the statute, the Legislature explicitly used the word "may" when giving MDWFP authority to issue animal control permits. "[A] basic tenet of statutory construction is that 'shall' is mandatory and 'may' is discretionary." *Wallace v. State*, 360 So. 3d 231, 237 (¶22) (Miss. 2023) (quoting *Khurana v. Miss. Dep't of Revenue*, 85 So. 3d 851, 854 (¶9) (Miss. 2012)). Therefore, this statute is clearly discretionary—meaning MDWFP has discretion to decide whether to issue an animal control permit.[9]

¶30. Our Legislature has also enacted a statute specifically to protect "[g]ame or fur-bearing animals . . . during periods of high water[.]" Miss. Code Ann. § 49-7-77 (Rev. 2012). The language of the high-water statute in section 49-7-77 commands that "it *shall* be

---

season was not open at the time Short's permitting qualms occurred and because Short has not asserted any claim based on harvesting the deer in his fields, this statute does not apply for the purposes of this appeal.

Nonetheless, section 49-7-31(4) goes on to state that MDWFP "may authorize the department to assist any farmer in this state, who sustains crop damage by wildlife, in eradication of the problem wildlife." To the extent each party relies on this portion of the statute, we note the general intent of the statute is to grant MDWFP discretion to assist farmers when their crops are being destroyed by deer.

[9] Additionally, the statute provides that these types of animal control permits can be issued if the animals are "injurious to agricultural *or other* interests in any particular community[.]" Miss. Code Ann. § 49-1-39. When interpreting statutes, "[w]e do not 'decide what a statute should provide, but . . . determine what it does provide.'" *Legislature of State v. Shipman*, 170 So. 3d 1211, 1215 (¶14) (Miss. 2015) (quoting *Palermo v. LifeLink Found. Inc.*, 152 So. 3d 1099, 1105 (¶13) (Miss. 2014)). We will "adopt that interpretation which will meet the true meaning of the Legislature." *Id*. (quoting *Scaggs v. GPCH–GP Inc.*, 931 So. 2d 1274, 1276 (¶10) (Miss. 2006)). Based on the "or other interests" catch-all, the statute does not just protect farming, but it also safeguards "other interests" that the animal may be injuring. Contrary to Short's belief, section 49-1-39 is not strictly an agricultural statute. Furthermore, there is nothing written in the statute that requires or imposes a duty on MDWFP to issue these kinds of permits to farmers.

*unlawful* to hunt, trap, take, frighten, or kill game or fur-bearing animals forced out of their natural habitat by high water . . . until they have been permitted to return to such habitat by recession of such water[.]" *Id.* (emphasis added).

¶31.    To reiterate, "the Legislature's statutory use of the term 'shall' connotes a mandatory requirement." *Wallace*, 360 So. 3d at 237 (¶22) (quoting *Tallahatchie Gen. Hosp. v. Howe*, 49 So. 3d 86, 92 (¶17) (Miss. 2010)). The high-water statute specifically uses the term "shall," making it clear that this statute is a mandatory legislative directive. By virtue of this mandate, MDWFP cannot allow the killing of game animals during high water conditions.

¶32.    Therefore, the Department was required to ensure that Short complied with this statute and did not unlawfully kill any deer while the water was high and when the deer were forced to migrate onto his property. This conclusion is further bolstered by a joint reading of the statutes.

¶33.    Short contends that the animal control permit statute "is not subject to the high-water provision," so the high-water statute was irrelevant.[10] He specifically insists that the terms of section 49-1-39 "do[] not contain an express 'high water' exception for issuing or rescinding such a permit[.]" According to Short, as a result, the permit statute "imposes a duty" on MDWFP to issue a "permit to any farmer who can show" the "deer are injurious to his agricultural operations, without regard to high water levels on the Mississippi River."

¶34.    "When the Legislature enacts multiple statutes in pari materia—that is, upon the same

---

[10] *See* Miss. Code Ann. § 49-1-39; *Id.* § 49-7-77.

subject—this Court generally will read the statutes together to interpret them harmoniously." *Brown v. State*, 102 So. 3d 1087, 1092 (¶23) (Miss. 2012). "[S]tatutes dealing with the same subject matter should be construed to give harmony to each." *Wallace*, 360 So. 3d at 236 (¶19). Where "several different sections of a Code deal with the same subject-matter, these sections are to be so interpreted . . . that they shall each be made to fit into the general and dominant policy of the particular system of which they are a part." *Id*. at 237 (¶19) (quoting *Choctaw County v. Tennison*, 161 Miss. 66, 134 So. 900, 901 (1931)).

¶35.    Both the animal-control statute (section 49-1-39) and the high-water statute (section 49-7-77) deal with the subject matter of wildlife and regulations for killing animals. They are also both enforced under the purview of MDWFP. Accordingly, precedent instructs these statutes to be construed as in pari materia and interpreted together.

¶36.    In doing so, we find that animal control permits are subject to the safeguards of the high-water statute. The high-water statute clearly and unambiguously makes it *wholly unlawful* to kill *any* deer that have been forced out of their usual territory by a high-water event. Miss. Code Ann. § 49-7-77. The shooting of deer—for any and all reasons—is only allowed to resume once the high water recedes and when the deer are able to return to their usual territory. Accordingly, animal control permits are restrained during high water conditions because the high-water statute prohibits *all* killings, without regard to the reason.[11]

---

[11] Furthermore, section 49-7-77 does not expressly limit its application to just "recreational" hunting, as Short insists.

¶37. Once Colonel Adcock learned of the existing high water conditions, he took steps to enforce the clear statutory directives of section 49-7-77. More specifically, he revoked Short's first animal control permit to prevent Short from unlawfully killing any deer while the water was high and to ensure compliance with the statute. In a previous case, our Supreme Court "determined that the Mississippi Commission on Environmental Quality acted arbitrarily and capriciously *by failing to follow* clear statutory directives[.]" *Lowe*, 760 So. 2d at 713 (¶12) (emphasis added) (citing *Miss. Dep't of Env't Quality v. Weems*, 653 So. 2d 266 (Miss.1995)). In contrast to *Lowe*, Colonel Adcock acted in accordance with clear statutory directives.

¶38. As a result, MDWFP's revocation of Short's original animal control permit was not arbitrary and capricious. Indeed, Colonel Adcock was *required* to take a high-water event or conditions into consideration when evaluating the appropriateness of Short's animal control permit.

¶39. In the alternative, Short claims the revocation of his permit was arbitrary and capricious due to a lack of evidence supporting MDWFP's decision. He alleges the evidentiary record shows "there was no occurrence of 'high water' on the Mississippi River on May 30, 2017[,]" when his permit was rescinded. Short also asserts there was no evidence supporting the Department's "mistaken determination" that deer were forced onto his fields by high river levels.

¶40. At trial, Colonel Adcock testified that he retrieved reports from the Mississippi River

gauge nearest to Short's property for May 2017. He explained that he used mapping software and looked up data from the River gauge nearest to Short's property, which was the gauge in Greenville. He testified that he reviewed the reports and found the level of the River was well over flood stage on May 29, 2017, and during the two previous weeks too. Colonel Adcock explained that this indicated the River that was in close proximity to Short's farm was experiencing a high-water event.

¶41. MDWFP entered a chart into evidence at trial titled, "Historic Data For Mississippi River @ Greenville, MS," which contains a list of the river level measurements spanning from April 1, 2017, through July 31, 2017. A notation at the top of the "Historic Data" chart specifies the flood stage for this particular gauge is "48 ft." On May 30, 2017, the date that Short's first permit was revoked, the river was measured at 51.89 feet, which was over three feet above flood stage. This evaluation alone is evidence that the permit revocation was not an arbitrary and capricious decision.

¶42. Short also raises the additional argument on appeal that MDWFP incorrectly used the Greenville gauge and should have used the Helena, Arkansas gauge instead. He bases this argument on a 2016 report from the Department that specified certain areas were to use certain gauges. However, Colonel Adcock testified at trial that the 2016 report was "a special public notice" from "the [20]16 deer hunting season," which was only drafted "to conduct rolling opening and closure" of hunting season. "The purpose for it was we were trying to give everybody as much opportunity as they could during hunting season, but also to abide

15

by 49-7-77 which states you cannot hunt any game animal that is affected by flood, high water or fire." Accordingly, we find Short's argument regarding the use of the Helena gauge instead of the Greenville gauge is without merit.

¶43. Colonel Adcock further testified that the discovery of the flooded River led him to conclude that the large number of deer on Short's property were forced out of their natural habitat due to the high water. Based on this conclusion, the prohibitive terms of section 49-7-77 were invoked. Colonel Adcock recounted that he understood that statute to speak directly to a required revocation of Short's permit to halt the unlawful shooting of deer given the high water conditions.

¶44. Based on a review of the record, substantial evidence supported the agency's conclusion that a high-water event was occurring on the river near Short's farm. Accordingly, we find that MDWFP's decision to revoke Short's original permit was not arbitrary and capricious because the high water conditions made it unlawful for Short to kill any deer at that time.

## II. Limiting the second permit to "does only" for safety reasons was not arbitrary and capricious.

¶45. Secondly, Short claims MDWFP's implementation of a "does only" limitation in his second set of animal control permits was arbitrary and capricious. He alleges he was the only applicant to receive this restriction and that there was no legitimate basis for limiting the deer he could shoot to "does only." Instead, Short insists the limitation was motivated by political pressure—specifically, that it "is solely the product of a suggestion from a member of an

16

adjacent hunting club to the Wildlife Commissioner." Short further argues he had difficulty distinguishing between bucks and does at night, so the limitation made him susceptible to criminal consequences.[12]

¶46. At trial, Colonel Adcock explained that safety concerns and precautions were MDWFP's basis for adding a "does only" restriction to the animal control permits. He stated, "This was something simply that was done as a safety issue to make people take an extra moment before they get out there and just start shooting and pulling the trigger." He also recounted that "some of these areas are close to towns. Some of them had people that lived next to that field," and the does only restriction "gives us an opportunity for that shooter to take an extra second before he pulls a trigger on that animal to make sure of his target and what's beyond it."

¶47. Furthermore, Colonel Adcock's trial testimony dispelled Short's claims that he was the first and only person to receive a permit with this "does only" restriction. He informed the trial court, "[W]e've had no complaints from any farmers about the does only process. And we're talking about 300 plus permits per year." In support of his testimony, MDWFP submitted copies of animal control permits issued to two other people in June 2017 that included a "does only" restriction—one of them was issued before Short's second permit,

---

[12] The trial court's order stated, "The Commission's revocation of Short's first permit, and the 'does only' restriction on his second permit were motivated, in part, by 'political pressure' that was generated by the reports and complaints from members of the 27 Break Hunting Club and the Black Bayou Hunting Club. But, the court also finds that the political pressure was not the Commission's primary motivation for its decisions."

17

and one was issued at the same time as Short's second permit.

¶48. Colonel Adcock also testified that all animal control permits issued since June 2017 have included that same "does only" restriction. But he elaborated, "I would like to clarify that there is one instance where we did not put a does only restriction on that. . . . That's on airports, federal airports and city airports." He continued, "[A] Cessna doesn't care whether it's got antlers or not. That's a safety issue. . . . [T]hey kill anything, any animal whatsoever on that runway."

¶49. Lastly, in response to Short's argument that it's difficult to distinguish a doe from a buck at night, Colonel Adcock testified, "the argument you can't tell a difference in a doe and a buck in May and June is absolutely crazy. . . . I shot deer on many farms for years when I first came on as an officer because we were the ones that did it. I didn't have any trouble with it."

¶50. After reviewing the record, we cannot find that MDWFP "offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of any agency expertise." *City of Tupelo*, 192 So. 3d at 955 (¶20) (quoting *Lowe*, 760 So. 2d at 714 (¶12)). There is substantial evidence supporting MDWFP's decision to implement the "does only" restriction out of safety concerns. Consequently, we find the "does only" limitation in Short's second-issued permits was not arbitrary and capricious.

    **III.    MDWFP and its officers were immune from liability for their permitting decisions.**

¶51.    On appeal, Short alleges MDWFP is not immune from liability for his claims because Colonel Adcock's decisions to revoke and restrict his permits were arbitrary and capricious and because the discretionary-function immunity exemption is not applicable to MDWFP's actions.

¶52.    The Mississippi Tort Claims Act "provides the exclusive civil remedy against a governmental entity or its employee for acts or omissions which give rise to a suit." *Towns*, 357 So. 3d at 1070 (¶20) (quoting *Horton ex rel. Est. of Erves v. City of Vicksburg*, 268 So. 3d 504, 508 (¶13) (Miss. 2018)). But the MTCA also "provides immunity to governmental entities in specified circumstances," enumerated in section 11-46-9(1) (Rev. 2019). *Dunston v. Miss. Dep't of Marine Res.*, 892 So. 2d 837, 841 (¶12) (Miss. Ct. App. 2005). "If any *one* of these exceptions apply, 'the government is completely immune from any claim arising from the act or omission complained of.'" *Simpson County v. McElroy*, 82 So. 3d 621, 624 (¶12) (Miss. Ct. App. 2011) (quoting *Willing v. Est. of Benz*, 958 So. 2d 1240, 1255 (¶40) (Miss. Ct. App. 2007)).[13]

¶53.    Section 11-46-9(1)(h) contains a "permit" exception which applies to actions "[a]rising out of the issuance . . . or revocation of . . . any . . . permit . . . or similar authorization where the governmental entity or its employee is authorized by law to determine whether or not such authorization should be issued . . . or revoked unless such [is]

---

[13] *See also Willing*, 958 So. 2d at 1255 (¶35) ("where any of the immunities enumerated in section 11-46-9(1) apply, the government is completely immune from any claims arising from the act or omission complained of").

arbitrary and capricious [in] nature[.]" Miss. Code Ann. § 11-46-9(1)(h) (Rev. 2019).

¶54.    Each of Short's claims is rooted in the animal control permits he applied for and received from MDWFP. Pursuant to section 49-4-4(6) cited earlier, Colonel Adcock was acting within the course and scope of his employment for the agency and was authorized by law to determine whether permits should be issued or revoked and the form and type. As we previously determined, Colonel Adcock did not act in an arbitrary and capricious manner when he revoked Short's first permit and placed restrictions on the second set of permits. Therefore, the Department is immune from liability under the permit exception.

¶55.    Short also argues, in the alternative, that MDWFP is not immune from liability under another subsection establishing a discretionary function exemption. However, because one of the other immunity exceptions applies, we do not reach the issue of the applicability of the discretionary function exception. *See McElroy*, 82 So. 3d at 624 (¶12).

## IV.    Short's due process rights were not violated.

¶56.    Lastly, Short claims that his "constitutional due process right to protect his property" was violated by MDWFP's permitting process. Short acknowledges that "[t]here is no Mississippi case directly on point" and, instead, directs us to a variety of cases from other states to argue his thesis that "[b]y seeking to kill deer on his agricultural land, Mr. Short was exercising his legal and constitutional right to protect his property so that he could grow, harvest and sell his soybeans."

¶57.    MDWFP asserts a variety of procedural bars in response, including that since "Short

20

himself is no longer personally subject to those depredation permits" his claim is moot, especially now because the temporary high-water event has subsided. In the alternative, MDWFP argues that "the Legislature properly recognized and sought to balance the legitimate economic interests of farmers and others from crop depredation, while protecting deer and other wildlife in the extreme events of high water or fire."

¶58.    Our State Constitution guarantees, "No person shall be deprived of life, liberty, or property except by due process of law." Miss. Const. art. 3, § 14. While Short grounds his argument on this section, our Constitution also guarantees "[t]he people have the right to hunt, fish and harvest wildlife, including by the use of traditional methods, *subject only to laws and regulations that promote wildlife conservation and management and that preserve the future of hunting and fishing, as the Legislature may prescribe by general law*." Miss. Const. art. 3, § 12A (emphasis added) (as amended on Dec. 2, 2014, after approval by general vote).

¶59.    So, at the outset, we see that our constitutional right to hunt and fish is subject to a sensible restriction—that it is not unlimited but, instead, balanced against the needs of conservation for those of future generations. Intimately tied to the immediate and present day act of hunting or fishing is that we are attempting to "preserve the future of hunting and fishing" so that it is not only *this* generation that is allowed to do so. This goal is why the authorizing statute points out that "[h]unting, trapping and fishing are vital parts of the heritage of the State of Mississippi," and the Legislature's goal is "to protect *and preserve*

21

these activities." Miss. Code Ann. § 49-7-1.1 (emphasis added). As that law points out, the Legislature hopes that through sensible regulation it can "preserve these activities for all generations to come." *Id*.

¶60.    We must also point out that while our citizens possess inalienable rights, these rights are not without limitations. For instance, while we have the right to seek remedies for harm done to us in our "lands, goods, person, or reputation" under Article 3, section 24, "[t]he Mississippi Constitution does not create an unlimited right of access to the courts." *In re Est. of Staten*, 391 So. 3d 236, 242 (¶19) (Miss. Ct. App. 2024). This limitation is why unjustified lawsuits may be ejected or why statutes of limitation can curtail access after a number of years—because "[n]o one, rich or poor, is entitled to abuse the judicial process." *Id*.

¶61.    For similar reasons, we have pointed out that even the Confrontation Clause can be restrained under certain circumstances—since "a defendant's right to cross-examination is not unlimited, and the Confrontation Clause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Kirby v. State*, 379 So. 3d 915, 927 (¶31) (Miss. Ct. App. 2024); *see also Gibbs v. State*, 141 So. 3d 1, 3 (¶9) (Miss. Ct. App. 2013) (holding that the right to counsel is critical, but "that right is not unlimited" and could be waived).

¶62.    Relatedly, the Mississippi Supreme Court has held that "[t]here is no fundamental right to sue the government for damages," as Short has done in this case. *Wells ex rel. Wells v. Panola Cnty. Bd. of Educ.*, 645 So. 2d 883, 896 (Miss. 1994). Instead, that process is

22

tightly regimented by the MTCA. *Wells* determined that "[a]s with the federal government, the State must waive sovereign immunity in order to be sued," and "[w]hen the State does waive sovereign immunity, it may attach any conditions to its consent, such as a provision excluding trial by jury." *Id*. at 898. In cases like this one, the right to sue is grounded upon showing that MDWFP acted outside its authority or in a manner that was arbitrary and capricious.

¶63.    We have thoroughly pointed out above why the Legislature has granted MDWFP the control over permits to kill or hunt deer and why those actions were not arbitrary and capricious in this case. To this, we will add the following: Short simply did not use the permits that he sought. The first permit, which was unlimited, he used to kill about 20 deer—despite reporting that he saw "175 deer the first night and 193 deer the second night," as the trial court found. When issued a second set of permits, albeit with the "does only" limitation, Short shot *zero* deer, just as he did when he obtained injunctive relief that temporarily reinstated his first permit.

¶64.    With limitations and without, Short did not act to preserve his crops by killing deer. Regardless of his asserted reasons, he sat on his rights under the permits. We have addressed why MDWFP did not act outside its authority in revoking the first permit or in placing the limitation in the second. Accordingly, we find this issue without merit.

**CONCLUSION**

¶65.    At the core, Short wants the unlimited authority to kill deer on his property as he sees

23

fit, when and how he wants. Yet statute after statute make expressly clear that an individual does not have such authority. Instead, MDWFP ultimately had the discretion to decide whether to grant Short an animal control permit to kill deer that were destroying his soybean crops and whether to subsequently revoke Short's permit. After review, we find that MDWFP's permitting decisions were not arbitrary and capricious, and the permit exemption to immunity applied to Short's claims. Accordingly, we affirm the trial court's order dismissing the claims.

¶66.    **AFFIRMED.**

**CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR.  BARNES, C.J., AND WILSON, P.J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**